# EXHIBIT A

1  VAN LONGYEAR, CSB NO. 84189
   JENNIFER MARQUEZ, CSB NO. 232194
2  AMANDA BUTTS, CSB NO. 253651
   Longyear, O'Dea and Lavra, LLP
3  3620 American River Drive, Suite 230
   Sacramento, Ca. 95864
4  Telephone: (916) 974-8500
   Facsimile: (916) 974-8510
5
   Attorneys for Defendant Sacramento County Board of Supervisors;
6  Deputy Pederson; Deputy Painter; Deputy Kacalek; Deputy Kearsing

7

8            UNITED STATES DISTRICT COURT  EASTERN DISTRICT

             OF CALIFORNIA SACRAMENTO DIVISION
9

10 ERIC MARTIN                              )   CASE NO. 2:07-CV-00863 FCD JFM P
                                            )
11       Plaintiff                          )   DECLARATION OF JOHN
                                            )   O'SHAUGHNASSY IN SUPPORT OF
12 v.                                       )   DEFENDANTS' MOTION FOR
                                            )   SUMMARY JUDGMENT AND/OR
13 SACRAMENTO COUNTY BOARD OF               )   SUMMARY ADJUDICATION
   SUPERVISORS, et al.                      )
14                                          )
         Defendants.                        )
15                                          )
                                            )
16                                          )
                                            )
17 _____ )

18       I, JOHN O'SHAUGHNASSY, declare:

19       1.      From January 2002 to January 2007, I was the Chief of Correctional Health

20 Services for Sacramento County.

21       2.      In that position I administratively oversaw delivery of the medical, mental health

22 and dental services at the adult correctional facilities including preparing budgets and receiving

23 and allocating funds.

24       3.      In my position, I have personal knowledge that the County of Sacramento

25 contracted with the Regents of the University of California to have the U. C. Davis Medical

26 Center provide mental health services for inmates housed at the Sacramento County Main Jail.  A

27 true and correct copy of the contract for the fiscal year 2005-2006 is attached hereto as Exhibit I.

28

LONGYEAR, O'DEA & LAVRA, LLP
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

4.      In 2005, Dr. Gregory Sokolov was the Medical Director for the Jail Psychiatric Services (JPS).

5.      As part of my duties I personally participated in budget preparation for CHS with the Sheriff and his executive staff.  As a result, I am personally aware that Correctional Health Services and the Sheriff's Department receive their funding from the Sacramento County General Fund which is controlled by the Sacramento County Board of Supervisors.

6.      Correctional Health Services ("CHS") provides medically necessary medical, mental health and dental care for adults detained at county operated correctional facilities.

7.      The Sheriff's Department oversees the basic and emergency health care services provided adults incarcerated within the county jail system and is responsible for administering CHS.

8.      I have personal knowledge that for the Fiscal Year 2004-2005, CHS was allocated approximately $28 million.

9.      I have personal knowledge that for the Fiscal Year 2005-2006, CHS was allocated approximately $34 million.

10.     The Sheriff's Department Correctional Health Services Division budget funds Jail Psychiatric Services ("JPS").

11.     I have personal knowledge that for the Fiscal Year 2005-2006, the Board of Supervisors approved services for JPS in the amount of approximately $5 million which was an increase of more than $500,000 from the previous year.

I declare under penalty of perjury that the foregoing is true and correct and based upon my personal knowledge.  If called as a witness, I would competently testify thereto.


Executed this 22nd day of April, 2009 at Sacramento, California.


                                        /s/ John O'Shaughnassy
                                        JOHN O'SHAUGHNASSY

                                        [Original Signature on File with Defense Counsel]

LONGYEAR, O'DEA & LAVRA, LLP
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

# EXHIBIT B

1  VAN LONGYEAR, CSB NO. 84189
   JENNIFER MARQUEZ, CSB NO. 232194
2  Longyear, O'Dea and Lavra, LLP
   3620 American River Drive, Suite 230
3  Sacramento, Ca. 95864
   Telephone: (916) 974-8500
4  Facsimile: (916) 974-8510

5  Attorneys for Defendant Sacramento County Board of Supervisors;
   Julie Pederson; Deputy Painter; Deputy Kacalek; Deputy Kearsing
6

7            UNITED STATES DISTRICT COURT  EASTERN DISTRICT

8                OF CALIFORNIA SACRAMENTO DIVISION

9

10  ERIC MARTIN                        )  CASE NO. 2:07-CV-00863 FCD JFM P
                                       )
11         Plaintiff                   )  DECLARATION OF JULIE
                                       )  PEDERSON IN SUPPORT OF
12  v.                                 )  DEFENDANT'S MOTION FOR
                                       )  SUMMARY JUDGMENT AND/OR
13  SACRAMENTO COUNTY BOARD OF         )  SUMMARY ADJUDICATION
    SUPERVISORS, et al.                )
14                                     )
           Defendants.                 )
15                                     )
                                       )
16                                     )
                                       )
17  _____  )

18       I, JULIE PEDERSON, declare:

19       1.     I am a defendant in this case.  I have received a copy of the Amended Complaint

20  and I am familiar with the allegations against me.

21       2.     From approximately 1996 to the present I have worked in law enforcement.

22       3.     I became a sergeant for the main jail in 2004.  During the period of November

23  2004 to October 2007, I worked as an upper floor supervisor and then a shift administrative

24  sergeant.  As a sergeant my duties included, but were not limited to, conducting disciplinary

25  hearings for inmates, visiting floors, reviewing log books, and responding to emergencies that

26  required a supervisor's response or presence.

27

28

LONGYEAR, O'DEA & LAVRA, L.L.P.
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

LONGYEAR, O'DEA & LAVRA, LLP
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

4.      Upon employment with the Sacramento County Sheriff's Department all deputies were required to complete a 22 week, 830-hour Peace Officer Standards and Training Basic Course.

5.      Within the basic academy training, deputies receive an 8-hour block training on mental health and suicide prevention.

6.      All deputy sheriffs who were initially assigned to the jail system must complete the 80-hour Corrections Officer Basic Training Academy Course.

7.      During the Correctional Officers Basic Training Academy Course the deputies received a two hour block on suicide prevention which included a review of the Sheriff's policies on suicide prevention as well as a informational booklet entitled, "You and the Mentally Ill: A Question of Responsibility."

8.      Once a deputy is assigned to work in the jail, the deputy is assigned a jail training officer (JTO).  The JTO works side by side with the trainee for a period of time which generally ranged from eight to twelve weeks. During that period of time the housing officers were trained regarding the proper procedures for handling an inmate who exhibited suicide ideation.

9.      JPS developed and provided quarterly training sessions during shift briefings, which ranged between 15 and 30 minutes.  The training included a detailed discussion of suicide risks and typical signs and manifestations.

10.     Starting in 2003, the medical and psychiatric departments began to participate in Advanced Officer Training which includes training in suicide prevention, mental health issues, and substance abuse withdrawal specific to a custody setting.

11.     A "Suicide Risk" information pocket card for officers and correctional health staff was developed by JPS and is provided to custody personnel.

12.     In 1996, I attended the Sheriff's Academy and completed a POST certified course. I graduated from the Academy and served primarily as a patrol officer, until August 2004.

13.     While in the Academy, I received training with respect to Welfare & Institutions Code section 5150.  I learned what to look for, and how to place a 72-hour hold on an individual that I concluded met the criteria of being a danger to self, danger to others or gravely disabled.

LONGYEAR, O'DEA & LAVRA, LLP
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

14.     After completing my training at the Academy, I was assigned to work in the Jail. When I started with the Jail I worked with Jail Training Officers and received on the job training for approximately two months.  During that time, I learned the policies, practices and procedures for dealing with suicidal inmates.

15.     I was taught that if I concluded that a person was potentially suicidal, my responsibilities as a housing officer required that I take steps to safeguard the inmate and refer the inmate to Jail Psychiatric Services (JPS).

16.     The primary practice for safeguarding a suicidal inmate, while waiting for a JPS assessment, is to remove the inmate from his or her cell and place them in a classroom that is located directly opposite the glassed control booth so that the inmate may be kept under observation of the control officer. Under most circumstances, the inmate is handcuffed in the classroom while he or she awaits assessment by qualified psychiatric staff.

17.     The inmate remained secured in that fashion until a mental health professional from JPS assessed the inmate and determined whether the inmate could be safely returned to his housing or whether the inmate should be rehoused in the inpatient psychiatric unit.

18.     After psychiatric staff makes the suicide assessment, if JPS determines that the inmate is suicidal, the inmate is housed in the in-patient psychiatric facility located on the second floor of the Main Jail.  This unit is called 2P or 2Psych.

19.     Sometimes, if there is no bed available in the in-patient facility, the inmate is maintained in the classroom until a bed opens.

20.     The Jail has an Acute Psychiatric Inpatient unit on its second floor.

21.     There is an Outpatient Psychiatric Unit located on 3 East which is used to house inmates with psychiatric problems that do not rise to the level which requires them to be in the Acute Inpatient Psychiatric Unit.

22.     Those inmates that engage in suicidal gestures but have been cleared by psychiatric staff may be returned to general population housing and required to wear "Blue Suits."

23.     All inmates held at the Main Jail must undergo an initial screening process.

24.   Following the initial screening, if inmates do not make bail or are not otherwise released, they deposit all of their personal effects, change into jail clothing, and proceed to classification.

25.   Classification is the process of managing the inmate population by using objective criteria and as much information as possible to determine the appropriate housing for inmates that also provide for the safety and security of the facility, inmates, and staff.

26.   Housing assignments are based on various factors including physical and mental disabilities, behavioral issues, security risks and general safety considerations.

27.   Classification decisions and housing assignments are made by classification officers.

28.   I am aware that the plaintiff has sued me because of my involvement with him while I was a sergeant in September of 2005.

29.   I am aware that the plaintiff contends that he should not have been removed from the classroom and returned to his cell on 8 West, but rather should have been placed on either the wait list for 2P or placed in 2P on suicide watch.

30.   As a sergeant, I cannot order JPS to admit an inmate to 2P or order JPS to place an inmate on a wait list for 2P, or order JPS to take any suicide precautions.

31.   The decision to remove Plaintiff from the 2P waiting list for a bed in the Acute Psychiatric Unit was made by JPS staff.

32.   On September 9, 2005,  I was summoned as the floor supervisor due to plaintiff's refusal to leave the 8 West classroom.  I notified him that he was required to return to his assigned housing in 8 West, pod 200 cell 14.

33.   I am not a psychologist or psychiatrist.  I have not received medical training except for first aid and CPR.  I have not been trained to diagnose mental illness and I am not qualified to determine whether or not someone is actively suicidal.

34.   I am not qualified by training or experience to conduct a suicide assessment, and I made no such assessment in this case.

LONGYEAR, O'DEA & LAVRA, LLP
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

LONGYEAR, O'DEA & LAVRA, LLP
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

35.     The plaintiff contends that I was one of the staff that had him wear a velcro safety suit.  The suit is called a "blue suit," even though some of the suits are green.

36.     I understand that the purpose of the safety suit is to provide some additional protection for certain inmates, in that the suit is made of materials that are not easily torn.

37.     The decision to place an inmate in a safety suit for mental health reasons is one that must be made by JPS.

38.     I did not have the authority to order that the plaintiff be placed in a safety suit. When I assisted in having the plaintiff wear the safety suit, as described in his complaint, I did so because it had been ordered by JPS.

39.     Cell 214 on 8 West was the plaintiff's cell that he had been assigned before he was placed in the classroom.  When he was taken off the wait list for 2Psych and ordered cleared for return to his housing, he was returned to his cell.

40.     I did not choose his cell, nor participate in any decision to house the plaintiff in that particular location.

41.     During the time that I worked in the Main Jail, I received periodic briefings from JPS regarding suicide prevention.  These briefings included reminders of various suicide risks and behavior.

42.     When I was dealing with the plaintiff, I knew that my job in dealing with a suicidal patient was to safeguard the inmate and refer the inmate to JPS for JPS to make the appropriate determination as to whether suicide precautions should be taken.

43.     When I dealt with the plaintiff as described in his complaint, I did so based on my training, experience, and according to policies and procedures in the Sacramento County Main Jail.

44.     When I returned the plaintiff to his cell from the classroom, I did so because I was told by JPS that they had determined that the plaintiff was not suicidal.

45.     I informed Plaintiff that he must return to his assigned housing and wear a safety suit due to the decision of JPS.

1    I declare under penalty of perjury that the foregoing is true and correct and based upon my

2    personal knowledge.  If called as a witness, I would competently testify thereto.

3

4    Executed this 24th day of April, 2009 at Sacramento, California.

5

6                                           /s/ Julie Pederson
                                           JULIE PEDERSON
7                                           [Original Signature on file with Defense Counsel]

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LONGYEAR, O'DEA & LAVRA, LLP
Attorneys at Law
3620 American River Drive, Suite 230
Sacramento, CA 95864-5923
Telephone (916) 974-8500 / Facsimile (916) 974-8510

# EXHIBIT C HAS BEEN OMITTED AND DOES NOT EXIST

---

# EXHIBIT C

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ERIC MARTIN,

        Plaintiff,

  vs.

COUNTY OF SACRAMENTO, et al.,

        Defendants.

_____/

**CERTIFIED COPY**

No. 2:07 CV 0863
      FCD JFM (PC)


DEPOSITION OF

**ERIC MARTIN**

Monday, June 30th, 2008


Reported by:

MARIA C. RIGGS

CSR No. 5526

Job. No. 19424LR



**PHILLIPS LEGAL SERVICES**
SACRAMENTO DEPOSITION REPORTERS
350 UNIVERSITY AVENUE, SUITE 270
SACRAMENTO, CA 95825
916.927.3600 · 916.927.3605 (FAX)
WWW.PHILLIPSDEPO.COM

1    A.        September 11th, 2005.

2    Q.        Okay.  And how long had you been incarcerated at

3    the county jail prior to the attempted suicide?

4    A.        Well, I got arrested June 18 -- July the 18th.

5    Q.        July the 18th?

6    A.        Yeah.

7    Q.        And what was the arrest for?

8    A.        It was for robbery.

9    Q.        And where did the robbery take place?

10   A.        In Sacramento.

11   Q.        Okay, in Sacramento.  And was it -- what place

12   did you rob?

13   A.        It was a restaurant.

14   Q.        A restaurant?

15   A.        Yes.

16   Q.        And prior to this July 18th, 2005 arrest for

17   robbery, had you been arrested previously?

18   A.        I had already been in the county jail.  I got

19   arrested initially in June the 27th of 2004.

20   Q.        Okay.

21   A.        And I was in the county jail, and I was fighting

22   my third strike for receiving stolen property.  I was in

23   a vehicle, and they tried to say that I stole it, and I

24   didn't.  I rented it for dope.

25            I gave somebody some drugs to use the car.  And

1   for a long time, I had it for like 18 hours, and it was

2   never reported stolen, and it turned out that the person

3   that gave me the vehicle did not own it.  It was her

4   ex-husband's vehicle.  So I was incarcerated at the time

5   from June the 24th until like July the 5th or 6th of

6   2005.

7        I was on parole at the time, and my parole hold

8   dropped.  I had a forty thousand dollar bail, and my

9   parole hold dropped.

10        And my brother had got murdered, and my family

11   had got my bail money up because I could bail out now.

12   I didn't have a parole hold.  And I bailed out, and then

13   I went and buried my brother.

14        And then about two weeks later, I got arrested

15   for the robbery, and I came back to the county jail.

16   And that's where things kind of started getting bad for

17   me.

18   Q.      And was that your third strike, you said?

19   A.      The third strike.  I was already fighting it

20   before the robbery.

21   Q.      And had you been incarcerated before the June 27,

22   2004 arrest at the jail?  Had you been at the jail prior

23   to that?

24   A.      Before?

25   Q.      Yeah.

1   happened, so I told them what happened.

2       He came in with Lori. I didn't know her name. I

3   just knew she was a red-headed lady. And I found out

4   their names when I came back to the county jail from the

5   state hospital, and that's when I found out who Steve

6   Buell was and who Lori was.

7   Q.      You said that Deputy Painter really tried to help

8   you. Can you elaborate --

9   A.      What I mean by that is -- I'm not trying to get

10  ahead of what we're going through, but once it got to the

11  point where they were telling me that they want me to put

12  my -- when they was telling me they wanted to put me back

13  in the cell later on, it was like hours later. I didn't

14  want to go.

15      And he kept telling me that, "Look, I know you

16  don't want to go, but if don't nobody come see you by

17  tomorrow, I'll make sure that someone comes to see you."

18  Q.      Did he tell you anything else?

19  A.      No, not after that, was just what he did. That's

20  how I know he was trying to help me.

21  Q.      Okay. So back on September 9th, 2005, after you

22  saw Lori Severance right after breakfast around 8:30,

23  what happened next?

24  A.      Nothing. They leave. She -- they go out the

25  classroom, and then they go into the office, which the

1   the visit with your girlfriend?

2   A.       I was told that if you are in the classroom or if

3   -- when I went to suicide watch -- finally after the

4   incident, my family tried to come visit me, and they told

5   them that I couldn't have visitors because I was on

6   suicide watch.

7           So if that applies for then, then it should apply

8   for when I was in the classroom wearing the outfit on

9   suicide watch until the bed was open.  And they gave me a

10  visit that day.

11          And then after my visit was over and I went to

12  the booth to check in, they came out the booth and told

13  me that they wanted to put me back in my cell, which was

14  a T sep cell in 2 West, 200 pod, 214.

15  Q.       And who was this that you're saying --

16  A.       This was deputy -- the deputies was there, except

17  Kearsing.  Kearsing was inside the office with the lady

18  there on that paperwork, Lori.

19  Q.       Okay.

20  A.       Okay?  This was hours after I seen her.  Him and

21  her were in the office, but Painter, Cakalach, the male

22  sergeant and Sergeant Peterson was in front of the

23  booth, and they were telling me that they wanted me to go

24  back to T sep.

25          Their words was, "We're going to move you out of

1   the classroom and move you back to your cell in 200 pod."

2   Q.      And did they tell you why they were doing that?

3   A.      At first, no.  I told them, my question to them

4   was, why am I going back?  I saw two doctors -- or two

5   people from Jail Psych Services, and they told me that I

6   was going to the second floor to go on suicide watch.

7   They told me that they needed -- the cell was needed, the

8   room, the classroom, was needed for somebody else.

9          And I refused to go back in my room, and I went

10  back to the classroom because it was open.

11  Q.      Did the deputies and sergeant ever tell you that

12  they were going to take you back to your cell which

13  was --

14  A.      8 West 214.

15  Q.      -- 214 8 West, because jail psychiatric services

16  made a determination that they were not going to put you

17  in as a 2-P, inpatient unit patient?

18  A.      When they first told me that they were putting me

19  back in my cell and I asked why and they told me that

20  they needed the cell for somebody else, my statement to

21  them was, I saw two people from Jail Psych Services, and

22  I was told I was going downstairs because I feel

23  suicidal.

24         Why am I going back down here?  Why am I going

25  back to my cell?  I ain't seen a doctor.  Ain't nobody

1    came and talked to me about what I'm going through.

2          And I'm in the classroom at this time, and

3    they're telling me, "Well, the doctor thinks that you may

4    be malingering."

5          I didn't know what malingering mean at the time.

6    And I asked them, "What does malingering mean?"

7          And wouldn't nobody say nothing to me.  They

8    wouldn't tell me what was going on, right.

9          So I refused.  I refused to go out the classroom

10   and put back on the safety suit or any of that.  I just

11   sat down on the mattress, and they left out the classroom

12   and they locked the door and they went back into the

13   control booth.

14         And I watched them; I looked at them.  That's

15   when I saw the lady that I saw the first time who wrote

16   that report, Lori.

17   Q.    Lori.

18   A.    That's when I seen her in the classroom, and

19   there was another guy in there, but I don't know who he

20   was.  I don't know if he was Steve Buell.  I don't know

21   who he was, but he was in the office as well.

22         And while they were in the office, they sitting

23   there for a minute.  Then when they came back, it was

24   only Painter, it was Cakalach, it was Kearsing and

25   sergeant.  No, my bad.

1    Q.        On here --

2    A.        Yes, sir.

3    Q.        -- the fellow that you saw on that date is Mark

4    Hopkins?

5    A.        Yeah.

6    Q.        You just added his name.

7    A.        I remember he had a ponytail.

8    Q.        Yeah.  He says in here -- well, what did you tell

9    him about your thoughts about suicide?

10            Did you tell him you were thinking about suicide

11   or not thinking about it?

12   A.        No.  What took place was, it was the first time

13   -- I didn't know he was coming to see me.  But the

14   officers in my unit, the same place that I bailed out of,

15   when I bailed out the county jail, I was in 8 West 200

16   pod.  And when I got brought back in, they put me back in

17   that unit because that's where I was before I bailed out.

18   Q.        Right.

19   A.        And the officers there, later on I talked to them

20   and they told me, "Man, you came in here tripping.  You

21   was tripping big time, and we start referring you to Jail

22   Psych Services because you wasn't talking to nobody.  You

23   was crying all the time."

24            And when I met this person, Mark, Mark came to

25   see me, and he told me that "The officers asked me to

1  come see you; what's going on?"

2       And I explained to him, "Man, you know, man, I

3  just bailed out of here.  I'm back.  I went to bury my

4  brother.  My brother got murdered, and it's really

5  bothering me."

6       And he said, "Well, what's going on with you?"

7       I said, "Man, I'm on parole.  I've taken

8  medication before for depression, and I'm going through

9  it again."

10       And he said, "Well, can you verify that you took

11  medication or that you're on parole?"

12       And I gave him a paper, and it's a paper that you

13  get when you get arrested and you come to Sac County

14  jail.  You have to see people from parole.  They come and

15  notify you that you're getting your parole revoked, and

16  they give you a form that says -- I have it.

17  Q.       But, Eric, did you tell him on that day that you

18  were thinking of killing yourself?

19  A.       Did I tell him on that day?

20  Q.       Yeah, Hopkins.

21  A.       I told Mark that I'm having bad thoughts and I

22  don't want to hurt myself, and I told him that I'm going

23  through it, and can you guys just check with CDC and see

24  what I took in the past so I can get some medication.

25  Q.       Did he ask you whether you were thinking of

1    hurting yourself right then that same day?

2    A.      No.  No, he didn't.

3    Q.      He has here that you did not have -- and you see

4    where it says S slash I?  That's shorthand for suicidal

5    ideation.  That means thoughts of suicide in shorthand.

6    A.      He had -- I understand, I understand.  And he

7    never asked me, did I feel suicidal.  He never asked me,

8    did I have any thoughts of harming myself.

9    Q.      And did you have thoughts of harming yourself on

10   that day?

11   A.      On that day, no.  On that day, I just wanted

12   somebody to help me get my medication, get me started on

13   some medication.  That's all.  I was going through it.

14          MR. TYLER:  Okay.

15          EXAMINATION BY MS. MARQUEZ (Continued)

16   Q.      You had been on psych medications --

17   A.      In the past for depression.  I lost my -- it

18   first started, my grandfather passed away, and . . . .

19   Q.      I guess my question is, prior to this August 8th,

20   2005 record that we have in front of us --

21   A.      Yeah.

22   Q.      -- you had been arrested on July 18th of 2005.

23          Had you between that time told anybody that you

24   had been on psych meds?  Had you --

25   A.      I ain't never seen anybody.  You mean from the

1        They asked me, do I think people can change --

2   can make me think certain things without talking to me by

3   looking at me.  They asked me, do I think I can change

4   the weather with just my thought, real stupid.

5        And I answered it, you know, no.  And I guess

6   because I didn't answer it the way I was supposed to,

7   that I was -- they said I was faking, because of this

8   test.

9        I'm trying to figure out why I was given a test

10  to see if I was crazy, when all I asked them to do was

11  help me because I was stressing behind my brother.  I

12  don't see why that would make me crazy.

13       I never went in there and told them I was

14  mentally retarded, and I never went near them and told

15  them that I was seeing things and hearing voices.  They

16  asked me, do I hear voices.

17       I told them, "Man, sometimes I hear my brother

18  talking to me, you know.  Sometime I lay back and I see

19  my brother's face."

20  Q.      So at some point --

21           FURTHER EXAMINATION BY MR. TYLER

22  Q.      This is a lady you talked to?

23  A.      This is a lady that I ended up finding out

24  through my medical charts that her name was Mrs. Dermott,

25  and she was the doctor from UC Davis coming to give me a

Case 2:07-cv-00863-FCD-JFM   Document 114   Filed 04/24/2009   Page 24 of 39

1    test.

2    Q.      Let me ask you just a couple questions about that

3    because you've got her in -- you've got her in the

4    amended complaint as a new defendant.

5    A.      Yeah, because when I did my first complaint, I

6    had none of this.

7    Q.      Okay.  Understood.  You got all of this stuff --

8    A.      After.

9    Q.      When did you get that file?

10   A.      I got this --

11   Q.      About?

12   A.      I got my file after I filed my complaint.  I

13   filed my complaint May the 7th, 2005.  And I ended up

14   getting this, oh, wow --

15   Q.      You can give me an estimate.

16   A.      It had to be somewhere in August of 2007, because

17   after I got it, I got copies and I sent it to the federal

18   courts.

19   Q.      You've talked about Dr. McDermott.

20   A.      Yeah.

21   Q.      And you've brought a complaint against her.

22           If I read the complaint correctly, what you're

23   saying is that she made an error in the -- in her

24   assessment, correct?

25   A.      She gave testimony in some paper in her

1   evaluation or whatever saying that I was malingering.

2       And I'm trying to figure out what I was

3   malingering because I didn't go -- nobody asked me ever,

4   ever, was I ever asked during this test -- it was about

5   fifty questions, and they all had to do with nothing

6   pertaining.  Nobody ever ask me in this survey that she

7   gave me, was I ever on medication, have I ever seen

8   doctors, what was I going through at the time, did you

9   lose a brother, are you stressing out?

10      It was nothing like that.  It was a test about a

11  bunch of questions that had nothing to do with anything

12  other than, do I think I can change the weather, do I

13  think people can affect my thoughts.

14      It was a bunch of real crazy -- real crazy

15  questions to be honest with you.

16  Q.      But you've brought her in -- you want to bring

17  her in as a defendant in this litigation?

18  A.      Well, it was her assessment that Dr. Sokolov went

19  on.

20  Q.      And you've said that the assessment is erroneous,

21  if I remember the word --

22  A.      Yeah.

23  Q.      -- that you used?

24  A.      Erroneous.

25  Q.      Yeah.  And do you think she did it intentionally

1  to you?

2  A.      I don't think that she did it -- I can't say that

3  she did it intentionally.  All I can say is, I was called

4  in to her and given a test by her, and she gave a

5  evaluation of what she feel as far as me taking the test,

6  okay.

7       My question on the whole issue is, if I showed

8  proof that I had taken medication before and was in a

9  program, why was I even sent to this lady, given this

10 certain test?  Because the test is basically about

11 testing you to see if you're faking symptoms, from what I

12 read on her evaluation report.

13      Now, if I saw the doctor -- and I did see

14 Dr. Sokolov before I saw her.  I seen him 8/24/2005, and

15 I told him that I was on medication before for depression

16 after the loss of my grandfather.  And I told Dr. Sokolov

17 that I have been going through some things here at the

18 county jail, and some things that taken place that the

19 deputies told me about that I don't remember.

20      And Dr. Sokolov asked me, have you ever had

21 blackouts or seizures, and I explained to him that in '96

22 I had been hospitalized in Doctors Hospital in Manteca

23 for blackouts and seizures.

24      And he said, "Is that true?"

25      And I told him, "Yes."

1    the inmates once you got back in 214?

2    A.      Oh, I went in there, and it was a bunch of

3    laughing and "What are you doing, man?  What's wrong with

4    you?  Why you got this on?"  This is what went down, you

5    know.

6            I said, "Man, I'm supposed to go to suicide

7    watch.  They're not sending me.  They put me in my cell."

8            And that was it.  I never saw no deputies again,

9    except they came through for dinner to feed or whatnot.

10           The following morning, somebody came and seen me

11   at my cell.

12   Q.      On September 10th?

13   A.      Yeah.  Somebody came and seen me.

14               FURTHER EXAMINATION BY MR. TYLER

15   Q.      Is that from jail psychiatric?  Or do you know?

16   A.      No.  It was -- yeah, it was somebody from jail

17   psychiatric.  It was somebody from there that came to see

18   me in my cell.

19   Q.      A man or a woman?

20   A.      It was a man.

21   Q.      Don't know his name, though?

22   A.      I should have it written down here somewhere.

23   9/9, 9/8.

24   Q.      You wrote 9/10?

25   A.      Okay, it's 9/10, somewhere, whatever.

1    A.       A lot of doctors that I saw dealing with my

2    depression and the medication was the Salinas Valley

3    State Prison.  That's where a lot of it actually took

4    place.  My grandfather died at Mule Creek -- when I was

5    at Mule Creek.

6            And shortly thereafter I was put in ad seg, and I

7    was moved to Mule Creek State Prison, and that's where I

8    started seeing Dr. Priest and Pratt and a lot of other

9    people, and I got on triple CMS and the whole nine yards.

10           From Mule Creek -- I was there.  That's where I

11   went, from Mule Creek to Doctors Hospital in Manteca,

12   because the incident that happened at Mule Creek is when

13   I started having blackouts and seizures, and they sent me

14   to Doctors Hospital in Manteca.

15   Q.       You were still in the safety suit when you

16   committed suicide, or attempted?

17   A.       That's -- when they found me, I was in there.

18   Q.       Do you know what you made the noose out of?

19   A.       No.  I think they got it, though.  I don't know.

20   I know that when I came to, the fire department was

21   there, and I was going down on the elevator.

22   Q.       What's the last thing you remember up to the

23   point of waking up at UCD or wherever?

24   A.       Getting in a argument with a officer on the

25   intercom.

1   file from here.

2          You'll see where I have interviews, numerous

3   interviews, with Dr. Miller and where I seen Dr. Marlett,

4   the medications they have me on 2002, three, the whole

5   nine yards.  It's all there.  So it's not like I just

6   made something up.

7   Q.      Dr. McDermott gave you the test.  I'll ask you

8   the same question about deliberate indifference.

9          Do you believe that she was deliberately

10  indifferent in concluding that as a result of that test,

11  that you were a malingerer?

12         I mean, that's sort of the standard that we use

13  in these things.

14  A.      You mean, do I believe that she deliberately just

15  like said screw my -- screw my needs, basically --

16  Q.      Yeah.

17  A.      -- is what you're asking me?

18  Q.      Well, let's start there.

19  A.      Well, she never asked me like, are you -- she

20  never asked me like, "Are you suicidal?"  She never asked

21  me nothing like that.  She never asked me, "Do you take

22  medication?"  Do you follow me?  She never asked me that.

23  Q.      She asked you all these --

24  A.      She asked me all these other stupid questions,

25  and it had nothing to do with what I was going through,

1   okay.

2         The reason I brought her in on my amended

3   complaint is because once I got to going through my

4   paperwork, me and my friend, it's like, "Man, it was her

5   -- her report.  It was her opinion of you that got you --

6   that got Dr. Sokolov saying you're malingering."

7         So I'm like, "Well, can we add her?"

8         He's like, "Yeah, we can add her," because it was

9   her erroneous assumption or whatever that was put in the

10  write-up, but that's why I added her.

11  Q.       Do you think Dr. Sokolov could not reasonably

12  rely on her report?

13        In other words, he's got this report that you see

14  that says that you're --

15  A.       Okay, he got the report.  Okay.  He relied on it.

16  Q.       Right.

17  A.       He relied on it.

18  Q.       So is that an error on his part?

19  A.       I believe it's an error on his part because not

20  one time, not one time, did Dr. Sokolov ever test me for

21  anything.  Not one time did Dr. Sokolov ever try to find

22  out.

23        See, I'm not mad at Dr. Sokolov for taking her

24  analogy of the tests.  Go ahead.

25  Q.       You're not mad at --

REPORTER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named; that said proceedings were reported by me, a duly Certified Shorthand Reporter of the State of California, and were thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of July, 2008.



_____
Maria C. Riggs, CSR No. 5526
Certified Shorthand Reporter
for the State of California

# EXHIBIT E

1   WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
    ROBERT F. TYLER (SBN 063055)
2   RTYLER@WILKEFLEURY.COM
    DANIELLE M. GUARD (SBN 173505)
3   DGUARD@WILKEFLEURY.COM
    400 Capitol Mall, Twenty-Second Floor
4   Sacramento, CA  95814
    Telephone:    (916) 441-2430
5   Facsimile:    (916) 442-6664

6   Attorneys for Defendants
    GERGORY SOKOLOV, M.D., BARBARA McDERMOTT,
7   Ph.D., LAURIE SEVERANCE, LCSW, and MARK
    HOPKINS, ACSW

8

                    UNITED STATES DISTRICT COURT
9
                FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11
    ERIC D. MARTIN,                      Case No: 2:07-CV-0863 FCD JFM PC
12
                Plaintiff,
13                                       DECLARATION OF CHARLES MEYERS,
    vs.                                  Ph.D., MLS IN SUPPORT OF MOTION
14                                       FOR SUMMARY JUDGMENT OR, IN THE
    COUNTY OF SACRAMENTO; et al.         ALTERNATIVE, SUMMARY
15                                       ADJUDICATION ON BEHALF OF
                Defendants.              DEFENDANTS
16
                                         Date:
17                                       Time:
                                         Courtroom:
18

19

20

21       I, Charles Meyers, Ph.D., MLS, do hereby declare.

22

23       1.      After obtaining my Bachelor of Science in Psychology from the College of the

    City of New York in 1960, I was a clinical fellow for the United States Public Health Services
24
    (1960-61), and a research fellow for the National Science Foundation (1961-62), both at Harvard
25
    University, after which I continued my studies at the University of London, Institute of Psychiatry
26
    (1962-66), obtaining a PhD in 1966.  I then did a post-doctoral internship at Massachusetts
27
    General Hospital (1966-67).  I also attended Stanford Law School (1980-82), obtaining a Master
28

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW
                                            -1-
        DECLARATION OF CHARLES MEYERS, Ph.D., MLS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

of Legal Studies degree (MLS). In 1991-92, I was a research fellow for the National Institute of Mental Health (NIMH) at the University of California at Berkeley School of Public Health. I am licensed both as a psychologist and as a marriage and family therapist by the State of California. I am a member of the American Psychological Association, of the American Psychology-Law Society, the past president of the Contra Costa County Psychological Association, and am an expert reviewer for the State of California's Board of Psychology. I was employed as a Clinical Psychologist at Highland General Hospital between 1967 and 1969, as a Clinical Psychologist (part time) at the state prison (CMF-Vacaville) between 1968 and 1972 and as a Senior Clinical Psychologist for the Probation Guidance Clinic of Alameda County between 1969 and 1973. Between 1973 and 2001was a Chief Clinical Psychologist for the Alameda County Healthcare Services Agency in which capacity I held the following appointments: Chief of the Eden Drug Abuse Program (1973-75); Chief of the Criminal Justice Mental Health Program (1975-97) and Community Program Director (CONREP) for Alameda County's forensic parole program (1986-2001). I was an adjunct lecturer at the University of California at Berkeley, School of Social Welfare, teaching a course in mental health and health law from 1995 to 2008, and have been director of Mental Health-Law Associates Forensic Psychology, a consulting service in Berkeley, California since 1979. Since retiring from most of my day jobs, I have continued to take assignments from the courts of Alameda, San Francisco and Marin counties when the matter of a defendant's competence or sanity is in controversy. Although primarily a clinician and administrator, I have written and lectured on the legal and policy ramifications of mental health care, both in general and in the correctional setting, and am familiar with relevant statutes and regulations, as well as the varying standards advocated by professional groups interested in correctional mental health issues. I am familiar with, and competent to testify to, the standard of care applicable to the mental health care professionals that provided care to Mr. Martin at the Sacramento County Jail in the fall of 2005.

/// 

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

-2-

**DECLARATION OF CHARLES MEYERS, Ph.D., MLS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

2.     I have been provided with various materials in formulating the opinions expressed below.  I have reviewed Mr. Martin's arrest reports and extensive criminal record; the Sacramento County Jail records (custody, medical and psychiatric, including all of the Jail Psychiatric Services ("JPS") chart notes of the interactions of Mr. Martin and the JPS team) from the time of his arrest until his conviction and transfer to prison; the alienists' reports of Dr. Schaeffer, Ebert and Hoffman on the issue of Mr. Martin's incompetence to stand trial; the complete Napa State Hospital records for the course of Mr. Martin's observation and treatment pursuant to California Penal Code section 1370; and Mr. Martin's legal pleading and deposition in this matter.  I have also received and reviewed various general records concerning the Suicide Prevention Task Force, Mr. Lindsay Hayes' commissioned suicide prevention report, and the UCD/County agreement for the provision of JPS services within the Sacramento County Main Jail, various lesson plans utilized by JPS conducting in-services and training to both JPS and custody staff, the JPS Policies and Procedures Manual, the JPS spreadsheets on the total number of jail suicides and attempted suicides between 1993 and 2003, and the Sacramento County Grand Jury Reports for years 2001/2002 through 2003/2004.  In 2005-2006, as part of a project to compare and evaluate suicide prevention procedures in representative California county jails, I visited the jail facilities and consulted with custody and treatment staff in the counties of Sacramento, San Francisco, San Mateo, Santa Clara, Alameda and Orange.

My understanding of Mr. Martin's interactions with the JPS staff in the fall of 2005 is as follows:

3.     Eric Martin, who has several aliases, including Marcus Griffin, was brought to the Sacramento County Jail in July of 2005.  Based upon his prior convictions and the new charges, Mr. Martin was facing a potential life sentence under California's three-strike law.

4.     Mr. Martin was referred to JPS on his own request and at the urging of custody staff. He claimed that he "was going through it," that he was not sleeping and that he was hearing voices; the custody staff claimed he was "really quiet and not his usual self."  He was first examined on August 8, 2005 by Mr. Mark Hopkins, a JPS psychiatric social worker, who found

Case 2:07-cv-00863-FCD-JFM Document 16-4 Filed 04/24/2009 Page 5 of 8

Mr. Martin saddened over his brother's recent murder, but without psychotic symptoms or indications that he was dangerous to self or others.

5.    Mr. Martin saw Dr. Sokolov for his follow-up psychiatric exam on August 24, 2005. Mr. Martin's presentation was different from what it had been for Mr. Hopkins: Mr. Martin complained of "hearing people," memory lapses, "people following me," and claimed to be subject to epileptic seizures since a head injury in 1996. He specifically asked for Seroquel and Wellbutrin, antipsychotic and antidepressant medication, respectively, that he said had been prescribed in prison.

6.    Both these medications, especially Seroquel, which inmates sometimes refer to as "quell" or "baby heroin," by 2005 had achieved a certain notoriety for their off-label use as drugs of abuse in jail and prison settings where they are commonly crushed, snorted or bartered. A 2004 report in the *American Journal of Psychiatry* estimated that 30% of the inmates seeking psychiatric services in the Los Angeles County Jail tried to obtain the drug by specifically asking for it and by faking schizophrenic symptoms.

7.    Noting what he called "bizarre affect" generally, and citing specifically the incongruity of Mr. Martin's laughing when he said he was experiencing auditory hallucinations, Dr. Sokolov concluded that Mr. Martin was either psychotic, possibly secondary to his seizure disorder, or that he was faking his symptoms. He prescribed neither antidepressant nor antipsychotic medication, and referred Mr. Martin for further examination to Dr. Barbara McDermott of the University of California at Davis, a psychologist and a specialist in discerning malingering (or "the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." (p. 739 Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, 2000.).)

8.    On August 31, 2005, Dr. McDermott and her psychiatrist fellowship student, Dr. Warburton, administered the Structured Interview of Reported Symptoms ("*SIRS*") test, a

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

-4-

structured interview designed to assess malingering of psychiatric symptoms. The testing indicated that Mr. Martin was faking mental health symptoms and using a variety of strategies to fake. Drs. McDermott and Warburton concluded that, "These results indicate that Mr. Griffin is malingering his psychiatric symptoms, most notably depressive or affective symptoms." Dr. Sokolov was so informed.

9.      Dr. Sokolov communicated to his staff Dr. McDermott's findings and his own conclusions that Mr. Martin was faking his symptoms.

10.      On September 9, 2005, at three in the morning, Mr. Martin was seen by Mr. Buell, a JPS mental health specialist who concluded that the inmate appeared to meet 5150 criteria, noting that he was claiming he had forgotten how he had come to be in jail, was saying that he had a cellmate when he was celled alone, and was stating an intention to kill himself. Since there were no beds available on the forensic psychiatric inpatient unit, the inmate was placed in a safety suit and placed under observation.

11.      Later that day Mr. Martin was seen three separate times by a JPS Social Worker, Lori Severance, who, during the course of the day, consulted with Dr. Sokolov twice. He informed her of the findings of Dr. McDermott and his own conclusion that Mr. Martin was malingering. The inmate was taken off the waiting list for the inpatient unit, but, as a cautionary tactic, was kept in the safety suit.

12.      The next day, September 10, 200, Mr. Martin was threatening "to take out officers to get the help that I need." He was interviewed again, this time by Michael Singer, LCSW. Mr. Martin told him that he was "upset and frustrated by these decisions" [not to hospitalize him, not to medicate him as he wished and to keep him in the safety suit] and "demanded an explanation to why he had been "blown off." Mr. Singer explained to him the staff's belief that he was faking his symptoms, but just to be cautious, he would remain in the safety suit. Mr. Martin said he wanted an additional consult with Dr. Sokolov and that his lawyer was getting records that would prove he was telling the truth and had been treated psychiatrically when he was last in prison. After consulting with interim JPS Program Manager, Paul Hendricks, and with custody staff, Mr.

WILKE, FLEURY, HOFFELT, GOULD & BIRNEY, LLP
ATTORNEYS AT LAW

-5-

Singer concluded that Mr. Martin's psychological presentation was more indicative of hostile indignation than depression; that he was not suicidal, despite his threats of violence to others, did not meet that Welfare and Institutions Code section 5150 criteria.

13.     The next morning, September 11, 2005, during scheduled cell check, Mr. Martin was found kneeling in his cell—not hanging off the ground (as is often misstated in the record)—apparently unconscious, a noose around his neck attached via a ten-foot homemade rope to a wall light fixture, a Bible on his desk opened to Psalm 51 ("Have mercy upon me, O God, according to thy loving-kindness…").

14.     After apparently responding to resuscitative efforts by jail medical staff, Mr. Martin was taken to UC Davis Medical Center where the doctors found "very faint erythematous marks over the trachea". Mr. Martin was discharged and returned to the jail the same day.

15.     I find that the actions of Dr. Sokolov and the JPS staff met the applicable standards of care, acting as reasonably competent and skilled professionals in these circumstances.

16.     These circumstances have at their center an accomplished trickster, an inmate who had acquired his third strike in a robbery where he had armed himself with a cigarette lighter shaped like a gun; who after his arrest had claimed he was developmentally disabled when he had faced his parole revocation hearing (a disability claim that made him eligible for legal assistance); who presented himself to his probation officer as "a validated member of the *Flat Dog Crips*," but who identified himself on his SCCJ jail admission checklist as a *Blood* who "needs to be separated from all *Crips*;" who would go on to establish a track record of multiple diagnoses during this incarceration including psychosis, brain damage, depression, mental retardation, antisocial personality and, most frequently, malingering.

17.     It was thoroughly reasonable for Dr. Sokolov, presented with a mélange of incongruous symptoms, to take them seriously, as he did, referring his patient for further neurological testing (which would turn out to be negative), and to be skeptical, as he was, referring his patient to a specialist in malingering for a second opinion. (Mr. Martin would also be found to be incompetent to stand trial by two out of three of the alienists who were appointed

WILKE, FLEURY,
HOFFELT, GOULD &
BIRNEY, LLP
ATTORNEYS AT LAW

-6-

to examine him for the Court—the third thought he was malingering—only to be found, when he was observed 24/7 for four months at Napa State Hospital, to have been malingering.) Once Dr. Sokolov's suspicions were confirmed, it was appropriate for him to share his findings and conclusions, as he did, with the clinical staff that was interacting with Mr. Martin on a regular basis.

18.   Given the objective circumstances presented to him, I find that the actions of Dr. Sokolov were entirely appropriate.  There were no objective reasons presented to Dr. Sokolov, or the staff of JPS, requiring them to hospitalize Mr. Martin in the psychiatric in-patient unit or place him in the medical infirmary under suicide watch.

19.   Because Dr. Sokolov and the JPS responded reasonably and appropriately to Mr. Martin's medical and psychological situation, there is no evidence, despite Mr. Martin's stated feelings that he had been "blown off," that Dr. Sokolov or his staff demonstrated deliberate indifference.  On the contrary, given the time spent on the case, his referrals to other specialists for second opinions, the subsequent interactions with other JPS professionals and the consults with collateral custody staff, it was not deliberate indifference to Mr. Martin's medical or psychological needs that Dr. Sokolov and the staff of JPS demonstrated, but rather close scrutiny and intense concern.

I declare under penalty of perjury that the foregoing is true and correct and of my own knowledge, and that if called, I could competently testify to the above.

Executed this _24_ day of March 2009, at Berkeley, California.

CHARLES MEYERS, Ph.D., MLS

WILKE, FLEURY, HOFFELT,
GOULD & BIRNEY, LLP
ATTORNEYS AT LAW
SACRAMENTO

-7-

DECLARATION OF CHARLES MEYERS, Ph.D., MLS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT