1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ERIC D. MARTIN,

11             Plaintiff,              No. 2:07-cv-0863 FCD JFM (PC)

12        vs.

13   COUNTY OF SACRAMENTO,
     et al.,
14
                Defendants.            FINDINGS & RECOMMENDATIONS
15
     _____/
16

17        Plaintiff is a state prison inmate proceeding pro se with a civil rights action

18   pursuant to 42 U.S.C. § 1983.  While confined at Sacramento County Jail as a pretrial detainee,

19   Plaintiff alleges in his first amended complaint that the named defendants violated his Eighth

20   Amendment rights by failing to provide him with adequate psychiatric care for his depression

21   and suicidal thoughts.  Plaintiff also alleges a violation of his Fifth and Fourteenth Amendment

22   rights to due process by Defendant Sacramento County Board of Supervisors for their alleged

23   failure to provide adequate funds to the Sacramento County Jail, resulting in inadequate mental

24   health care for inmates, and its alleged failure to hold the Sacramento County Jail to the

25   standards set forth by California statute.

26        Before the court are two motions for summary judgment.  The first was filed by

     defendants Dr. Gregory Sokolov, M.D.; Barbara McDermott, Ph.D.; Laurie Severance; and Mark

                                          1

Hopkins.  (Doc. No. 115.)  The second motion for summary judgment was filed by defendants

Sacramento County Board of Supervisors, Sergeant Julie Pederson, Deputy Brian Painter,

Deputy Ryan Kacalek, and Deputy Jason Kearsing.  (Doc. No. 129.)

For the reasons set forth below, the undersigned recommends that the court

partially grant the motion for summary judgment filed by defendants Dr. Sokolov, Dr.

McDermott, Severance; and Hopkins; and grant the motion for summary judgment filed by

defendants Sacramento County Board of Supervisors, Sergeant Pederson, Deputy Painter,

Deputy Kacalek, and Deputy Kearsing.

### PROCEDURAL BACKGROUND

On May 7, 2007, plaintiff filed a complaint against Sacramento County,

Sacramento County Sheriff Department, Dr. Sokolov, Deputy Pederson, Deputy Painter, Deputy

Kacalek, and Deputy Kearsing.  (Doc. No. 1.)

On January 10, 2008, defendants County of Sacramento and Sacramento County

Sheriff Department were terminated from this action by order of the Honorable Kimberly J.

Mueller.  (Doc. No. 14.)

On April 24, 2008, this matter was referred to the undersigned in light of a notice

of a related case.  (Doc. No. 30.)

On June 19, 2008, plaintiff filed an amended complaint against defendants

Sacramento County Board of Supervisors; Barbara McDermott, Ph.D.; Gregory Sokolov, M.D.;

Lori Severance, L.C.S.W.; Mark Hopkins, A.S.W.; Sergeant Pederson; Deputy Painter; Deputy

Kakalach; and Deputy Kearsing.  (Doc. No. 64.)

On April 3, 2009, defendants Sokolov, McDermott, Severance, and Hopkins filed

a motion for summary judgment.  (Doc. No. 115.)  These defendants seek summary adjudication

on the ground that plaintiff cannot demonstrate that they acted with deliberate indifference.

They argue plaintiff was malingering his symptoms in order to obtain psychiatric care and/or

psychiatric medication for potential drug abuse and a mental health defense for his criminal trial

where he was facing life imprisonment on a three strikes charge. They rely upon the following in support of their motion: (1) the declaration of Charles Meyers, Ph.D.; (2) the deposition of plaintiff; (3) plaintiff's medical records from Jail Psychiatric Services ("JPS"); (4) plaintiff's records from Sacramento Superior Court; (5) plaintiff's records from U.C. Davis Medical Center; and (6) the declaration of Michael Vitacco, Ph.D. Alternatively, these defendants seek qualified immunity.

On April 24, 2009, defendants Sacramento County Board of Supervisors, Julie Pederson, Brian Painter, Ryan Kacalek, and Jason Kearsing filed a motion for summary judgment. (Doc. No. 129.) These defendants seek summary adjudication on the ground that plaintiff cannot demonstrate that they acted with deliberate indifference. They rely upon the following in support of their motion: (1) the declaration of John O'Shaughnassy; (2) the declaration of Julie Pederson; (3) the deposition of plaintiff; (4) the declaration of Charles Meyers, Ph.D.; (5) the declaration of Michael Vitacco, Ph.D.; (6) plaintiff's medical records from JPS; (7) the declaration of Ryan Kacalek; (8) the declaration of Brian Painter; (9) the declaration of Jason Kearsing; (10) plaintiff's medical records from U.C. Davis Medical Center; (11) plaintiff's records from Sacramento County Sheriff's department; and (12) the declaration of Lieutenant Chet Madison, Jr. Alternatively, these defendants seek qualified immunity.

## FACTS[1]

Plaintiff Eric Martin[2] has a lengthy criminal record, including the following convictions: (a) on June 28, 1990, plaintiff was convicted of robbery, a "serious felony" that comes within the provisions of Cal. Penal Code § 667(b)-(i) and 1192.7(c), California's three strike law; (b) on April 25, 1994, plaintiff was convicted of robbery and attempted kidnapping, both also considered "serious felonies" under California's three strike law. (See Doc. No. 116,

---

[1] The following facts are undisputed except when noted otherwise.

[2] Plaintiff's medical and prison documents are listed under his aliases "Eric Green" and "Marcus Griffin." (See e.g., Doc. No. 116, Ex. C at 27; Ex. D at 17.)

Ex. D at 8-11.)

While incarcerated, plaintiff's medical records reflect an extensive mental health history. (See Am. Compl., Ex. A; Pl.'s Opp'n, Ex. D.) The records document diagnoses of depression and bipolar disorder, as well as the numerous medications he had been prescribed, including Amitriptyline, Zoloft, lithium, and Sertraline. (Id.)

On June 27, 2004, plaintiff was arrested on charges of receiving stolen property, possession of a switch blade knife, and a parole violation. (See Pl.'s Decl. ¶ 4; Doc. No. 116, Ex. D at 17-18.) He was housed at the Sacramento County Jail awaiting trial facing his third strike. (Pl.'s Dep. at 13-14.)

In early July 2005, plaintiff's brother was murdered. (Pl.'s Dep. at 12.) Plaintiff posted bail to assist with his brother's burial. (Id.)

During the period of June 27, 2004 to his release on bail in early July 2005, plaintiff was not seen by nor requested to be seen by Jail Psychiatric Services ("JPS"). (Doc. No. 116, Ex. C at 5, 12.)

On July 18, 2005, plaintiff returned to Sacramento County Jail following his arrest for robbery, burglary and a parole hold. (Pl.'s Dep. at 11:4-5; Doc. No. 116, Ex. D at 8-11.)

On July 26, 2005, plaintiff requested to see psychiatric staff because he was "having sleep problems and hearing voices." (See Doc. No. 116, Ex. C at 22.) There is no evidence that plaintiff was seen following this request.

On August 8, 2005, JPS was contacted by a housing officer regarding plaintiff. (See Doc. No. 116, Ex. C at 21.) The referral form provides: "[Inmate] states 'He's going through it.' Wants to speak to someone in Psych Services. Officer states he's been really quiet and not his usual self – Is requesting a [psych] evaluation soon (please)." (Id.)

On August 8, 2005, plaintiff was seen by Mark Hopkins, a social worker employed by JPS. (Doc. No. 116, Ex. C at 8.) Defendants assert both plaintiff and custody staff

4

requested that plaintiff be seen by JPS. (See Doc. No. 116 at 3.) Although plaintiff's amended complaint is congruous with this statement, in his amended complaint plaintiff stated that he did not affirmatively request to be seen by JPS; rather, custody staff initiated the request based on plaintiff's altered demeanor from his incarceration prior to posting bail. (See Pl.'s Decl. ¶ 6.)

Hopkins' notes indicate that the purpose of his visit was that the "[d]eputies report that he has not been acting his usual self, tending to be isolative and less social than prior incarcerations. . . . The deputies report that he has been very quiet and withdrawn this incarceration which they report is completely different from previous incarcerations." (Pl.'s Mem. of P & A's, Ex. A at 5 (2 of 3)[3].)

Hopkins' notes further provide, in relevant part:

Thought processes linear. Depressed mood with tearful affect by the end of the interview. No S/I, H/I. Reports no Hx of suicide attempts. No evidence of psychotic sxs. Reports 1-2 hours sleep per night. Reports that he has been "going through it" like he never has before during this incarceration.

Described a strange scenario leading up to his arrest and being unaware of things for the first almost 24 hours in jail. Reports his brother had been killed recently and he got out of jail on bond to be able to go to the funeral. No Hx with JPS on prior incarcerations.

Reports he had been with [the Correctional Clinical Case Management System ("CCCMS")[4]] when he got out of prison the last time and showed some paperwork that indicated getting out of prison on 10/02 with CCCMS circled on it.

(Pl.'s Mem. of P & A's, Ex. A at 5 (2 of 3).)

During his deposition, plaintiff testified as to the following regarding his visit with defendant Hopkins:

---

[3] Plaintiff uses a unique numbering system in referencing his exhibits. For example, "Page 5" of Exhibit A actually refers to a three-page document, each page labeled "Pg. 5, 1 of 3" and so on. To avoid confusion, the court will utilize plaintiff's numbering system when referring to his exhibits.

[4] CCCMS is a designation for prisoners who are prescribed psychotropic drugs for behavioral management.

Q.  Did you tell [Hopkins] you were thinking about suicide or not thinking about it?

A.  No. What took place was, it was the first time – I didn't know he was coming to see me. But the officers in my unit, the same place that I bailed out of, when I bailed out the county jail, I was in 8 West 200 pod. And when I got brought back in, they put me back in that unit because that's where I was before I bailed out.

Q.  Right.

A.  And the officers there, later on I talked to them and they told me, "Man, you came in here tripping. You was tripping big time, and we start referring you to Jail Psych Services because you wasn't talking to nobody. You was crying all the time."

   And when I met this person, . . . [Hopkins] came to see me, and he told me that "The officers asked me to come see you; what's going on?"

   And I explained to him, "Man, you know, man, I just bailed out of here. I'm back. I went to bury my brother. My brother got murdered, and it's really bothering me."

   And he said, "Well, what's going on with you?"

   I said, "Man, I'm on parole. I've taken medication before for depression, and I'm going through it again."

   And he said, "Well, can you verify that you took medication or that you're on parole?"

   And I gave him a paper, and it's a paper that you get when you get arrested and you come to Sac County jail. You have to see people from parole. They come and notify you that you're getting your parole revoked, and they give you a form that says – I have it.

Q.  But, [Plaintiff], did you tell him on that day that you were thinking of killing yourself?

A.  Did I tell him on that day?

Q.  Yeah, Hopkins.

A.  I told [Hopkins] that I'm having bad thoughts and I don't want to hurt myself, and I told him that I'm going through it, and can you guys just check with CDC and see what I took in the past so I can get some medication.

Q.  Did he ask you whether you were thinking of hurting yourself right then that same day?

A.  No.  No, he didn't.

Q.  He has here that you did not have – and you see where it says S slash I?  That's shorthand for suicidal ideation.  That means thoughts of suicide in shorthand.

A.  He had – I understand, I understand.  And he never asked me, did I feel suicidal.  He never asked me, did I have any thoughts of harming myself.

Q.  And did you have any thoughts of harming yourself on that day?

A.  On that day, no.  On that day, I just wanted somebody to help me get my medication, get me started on some medication.  That's all.  I was going through it.

(Pl.'s Dep. at 33-35.)

Defendant Hopkins found that plaintiff did not meet "5150 criteria"[5] and advised that he remain housed "per custody."  (Pl.'s Mem. of P & A's, Ex. A at 5 (2 of 3).)  Hopkins also referred plaintiff to be seen by a psychiatrist with JPS.  (Id.)

On August 11, 2005, plaintiff's medical notes indicate that defendant Dr. Sokolov, the Medical Director for JPS, attempted to meet with plaintiff, but the latter was unavailable.  (Pl.'s Mem. of P & A's, Ex. A at 5(2 of 3).)  Dr. Sokolov rescheduled the visit for August 24, 2005.  (Id.)

On August 22, 2005, custody staff contacted JPS at 4:30 a.m.  (See Doc. No. 116, Ex. C at 23.)  Per the referral notes, "Custody really wants this guy seen! Tonite?"  (Id.)  The custody staff was advised that plaintiff was scheduled for a meeting on August 24, 2005 with

---

[5] California's Welfare and Institutions Code section 5150 provides, in part:

When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

JPS.  (Id.)

On August 24, 2005, plaintiff was seen by Dr. Sokolov.  (Doc. No. 116, Ex. C at 13; O'Shaughnassy Decl. ¶ 4.)  Dr. Sokolov's medical notes indicate that plaintiff's family told him he "was acting funny before [his] arrest" and that he "was running down the street" without his clothes.  (Doc. No. 116, Ex. C at 13.)  The notes also indicate that plaintiff reported not sleeping at night, talking to himself, and having problems upon his return to jail.  (Id.)  Plaintiff reported people were talking to him "when no one is there," causing plaintiff to laugh.  (Id.)  Plaintiff had prolonged answers in response to questions and stated "people are following me" and that he was "hearing people."  (Id.)

The notes further provide that plaintiff had previously been prescribed medication and was seen at the Doctor's Hospital of Manteca.  (Id.)  Dr. Sokolov indicated that he would request those medical records.  (Id.)

Though it does not state how this information was obtained, Dr. Sokolov wrote in his notes the names of the following medications: "Seroquel" and "Wellbutrin."  (Doc. No. 116, Ex. C at 13.)  Seroquel and Wellbutrin, antipsychotic and antidepressant medication, respectively, allegedly have a reputation for their off-label use as drugs of abuse in jail and prison settings where they are commonly crushed, snorted or bartered.  (Meyers Decl. ¶ 6; Doc. No. 116, Ex. C at 4.)  A 2004 report in the *American Journal of Psychiatry* estimated that 30% of the inmates seeking psychiatric services in the Los Angeles County Jail tried to obtain the drug by specifically asking for it and by faking schizophrenic symptoms.  (Meyers Decl. ¶ 6.)

Defendants' position is that plaintiff requested these medications.  (See Doc. No. 116, Ex. C at 4; Meyers Decl. ¶ 6.)  In his deposition, plaintiff refutes this position, testifying instead that he was merely responding to a question posed by Dr. Sokolov:

> A: I started having problems. It was bothering me, okay? Losing my brother was bothering me.
>
> . . .
>
> /////

A:  And I brought to their attention that I was going through it. "Can you please get my file and help me get the medication that I take – that I've taken previously for depression," okay?

Q:  And that was the Seroquel and the Wellbutrin?

A:  They asked me, did I take Seroquel. I told them I don't know if I take [*sic*] Seroquel.

If you see that paper right there, you'll see my initial interview, I told them that I've taken lithium before. I've told them that I've taken sertraline, Amitriptyline. There was numerous things I told them about.

The one time that Seroquel was mentioned, it was mentioned when a doctor asked me, "Have you ever taken Seroquel before?"

And I told him, "Yeah, I think I have." On my initial interview, I told them that I've taken lithium before.

They said, "Have you ever taken Seroquel?"

And I said, "Yeah, I believe I had." Because I didn't know what Seroquel was, and I didn't know what lithium was, but I remember they gave it to me, and I know it was because they wanted to balance my highs and my lows . . . .

(Pl.'s Dep. at 83-84.)

Lastly, plaintiff was asked whether he ever had any seizures, to which he responded he had previously. (Doc. No. 116, Ex. C at 13.) Plaintiff testified during his deposition that his last seizure was in 1996 and that he was hospitalized at the Doctor's Hospital in Manteca, but Dr. Sokolov's medical notes list the last seizure as July 2005. (Id.; Pl.'s Dep. at 108.)

During his meeting with Dr. Sokolov, plaintiff signed a release to allow the doctor to obtain plaintiff's medical records from the Doctor's Hospital in Manteca. (Pl.'s Mem. of P & A's, Ex. A at 6.)

Dr. Sokolov noted plaintiff's "bizarre" affect. (Doc. No. 116, Ex. C at 13.) He diagnosed plaintiff with a psychotic disorder (not otherwise specified), which he concluded was due to secondary effects of a seizure disorder or from malingering. (Id.) There is no evidence that defendant Dr. Sokolov ever obtained plaintiff's medical records.

Also on August 24, 2005, Dr. Sokolov referred plaintiff for consultation related to his seizures, which, on this document, are listed as having occurred in 1996. (Doc. No. 116, Ex. C at 24.) There is no evidence that plaintiff was in fact seen regarding this referral.

On August 28, 2005, upon request of custody staff, plaintiff was again seen by JPS. (Am. Compl., Ex. A at 20-21.) Defendant Hopkins again interviewed plaintiff. (Id.) Hopkins's notes are reproduced below:

> Referred by custody for psychotic thinking. They report he is "seeing things in his cell." Interviewed through the food port in his cell. The cell was clean. Client came to the food port naked. Thought processes linear. Irritable mood with restricted affect. No S/I, H/I. Reports that he believes custody is putting people in his cell because he can hear them talking. At one point during the interview, he got up and urinated into his toilet without any thought of someone observing this.

> I had introduced myself at the beginning. Later, he asked who I was. He also indicated that he did not see the doctor a few days ago despite the doctor's note from the visit. During the interview, there was no evidence of him responding to external stimuli.

> No S/I, H/I. Does not meet 5150 criteria. Housing per custody.

(Id. at 21.)

On August 31, 2005, plaintiff was evaluated by Defendant Dr. Barbara McDermott, a psychologist with the U.C. Davis Medical Center,[6] based upon the referral of defendant Dr. Sokolov to rule out malingering (Am. Compl., Ex. A at 20-21.) Dr. McDermott found as follows:

> **Referral**
> [Plaintiff] was referred for a psychological evaluation to determine the veracity of his reported symptoms. . . . He stated that he was referred to Jail Psychiatric Services by custody officers, noting "They think I'm crazy." . . .

---

[6] The County of Sacramento contracts with the Regents of the University of California to have the U.C. Davis Medical Center provide mental health services for inmates housed at the Sacramento County Main Jail. (O'Shaughnassy Decl. ¶ 3; Doc. No. 116, Ex. I at 6.)

**Test Results**

The [Structured Interview of Reported Symptoms ("SIRS")] was administered to evaluate the veracity of [plaintiff]'s reported symptoms. The SIRS is a structured interview designed to assess exaggeration or malingering of psychiatric symptoms. Questions are designed to assess honest responding on eight primary scales: Rare Symptoms (RS), Symptom Combinations (SU), Improbable or Absurd Symptoms (IA), Blatant Symptoms (BL), Subtle Symptoms (SU), Severity of Symptoms (SEV), Selectivity of Symptoms (SEL) and Reported vs. Observed Symptoms (RO). Responses on these scales are classified as honest, indeterminate, probable or definite. An individual is considered to be feigning psychiatric symptoms if he/she scores in the definite range on at least one subscale or the probable range on three or more scales.

[Plaintiff] scored in the probable range on five subscales: the scale measuring reporting of symptoms that occur infrequently in patients, the scale measuring the reporting of obvious signs of a mental disorder, the scale measuring the reporting of everyday problems not generally viewed as indicative of mental illness, the scale measuring the extent of symptom endorsement and the scale measuring the endorsement of symptoms with extreme or unbearable severity (RS, BL, SU, SEL, SEV). He scored in the indeterminate range on two subscales: the scale measuring the reporting of unusual symptom combinations and the scale measuring the reporting of symptoms or behaviors that are not observed (SC, RO). These results indicate that [Plaintiff] is malingering his psychiatric symptoms, most notably depressive or affective symptoms. It is important to clinically understand the purpose of this exaggeration. [Plaintiff] should be interviewed regarding the desired outcome of his referral to psychiatry.

(Doc. No. 116, Ex. C at 6.)

At his deposition, plaintiff testified as to the following regarding his examination by Dr. McDermott:

> A: [Dr. McDermott and her psychiatrist fellowship student] did come see me . . . but they asked me a bunch of questions, a bunch of stupid questions that really didn't make no sense to me.
>
> They asked me, do I think people can change – can make me think certain things without talking to me by looking at me. They asked me, do I think I can change the weather with just my thought, real stupid.

And I answered it, you know, no. And I guess because I didn't answer it the way I was supposed to, that I was – they said I was faking, because of this test.

And I'm trying to figure out why I was given a test to see if I was crazy, when all I asked them to do was help me because I was stressing behind my brother. I don't see why that would make me crazy.

I never went in there and told them I was mentally retarded, and I never went near them and told them that I was seeing things and hearing voices. They asked me, do I hear voices.

I told them, "Man, sometimes I hear my brother talking to me, you know. Sometime I lay back and I see my brother's face."

. . .

And I'm trying to figure out what I was malingering because I didn't go – nobody asked me ever, ever, was I ever asked during this test – it was about fifty questions, and they all had to do with nothing pertaining. Nobody ever ask me in this survey that she gave me, was I ever on medication, have I ever seen doctors, what was I going through at the time, did you lose a brother, are you stressing out?

It was nothing like that. It was a test about a bunch of questions that had nothing to do with anything other than, do I think I can change the weather, do I think people can affect my thoughts.

It was a bunch of real crazy – real crazy questions to be honest with you.

. . .

My question on the whole issue is, if I showed proof that I had taken medication before and was in a program, why was I even sent to this lady, given this certain test? Because the test is basically about testing you to see if you're faking symptoms, from what I read on her evaluation report.

Now, if I saw the doctor – and I did see [defendant] Sokolov before I saw her. I seen him 8/24/2005, and I told him that I was on medication before for depression after the loss of my grandfather. And I told Sokolov that I have been going through some things here at the county jail . . . .

(Pl.'s Dep. at 41, 43-44.) Plaintiff further testified that he did not think Dr. McDermott intended

12

her results to be erroneous or that she engineered the test to give plaintiff bad results.  (See id. at 43-45.)

On September 8, 2005, plaintiff was referred by the Sacramento County jail staff to JPS after plaintiff stated that he felt "like hurting himself."  (Doc. No. 116, Ex. C at 26.)

Deputies employed at the Sacramento County Jail are trained as to what to look for and how to place a 72-hour hold on an individual that they conclude meets the criteria of being a danger to him or herself or others or are gravely disabled.  (See Kacalek Decl. ¶ 7.) They are taught that if they conclude that a person is potentially suicidal, their responsibility as a housing officer requires that they take steps to safeguard the inmate and refer the inmate to JPS. (Id. ¶ 9.)

The primary practice for safeguarding a suicidal inmate while waiting for a JPS assessment is to remove the inmate from his or her cell and place him or her in a classroom that is located directly opposite the glassed control booth so that the inmate may be kept under observation of the control officer.  (Kacalek Decl. ¶ 11.)  Under most circumstances, the inmate is handcuffed in the classroom while he or she awaits assessment by qualified psychiatric staff. (Id.)  After psychiatric staff makes the suicide assessment, if JPS determines that the inmate is suicidal, the inmate is housed in the in-patient psychiatric facility located on the second floor of the Mail Jail.  (Id. ¶ 12.)  This unit is called 2P or 2Psych.  (Id.)

Per this protocol, plaintiff was placed in an observation classroom and ordered to wear handcuffs. (Id. at 26, 28.)

On September 9, 2005 at 3:00 a.m., plaintiff was seen by a JPS staff member. (Am. Compl., Ex. B at 7.)  The medical record provides the following:

> After about 10 minutes of a rambling account of events previously
> described on this chart, claims he has cell mate when he does not
> (A/H), doesn't know why he's in jail, saying he's been found running

> naked in his cell by custody but doesn't remember. Speculating that he may have unknowingly smoked PCP prior to committing reported crime and doesn't remember anything to do with the alleged crime. He was finally asked re S/I and responded, "Hell yes. . . Any way I can." He appears to meet 5150 criteria. . . . Placed on 2P waiting list.

(Id.)

On September 9, 2005 at 8:30 a.m., defendant Severance, a social worker with JPS, interviewed plaintiff in the classroom. (Doc. No. 129, Ex. G at 15.) Plaintiff continued to state he had suicidal thoughts and auditory hallucinations that agitated him. (Id.) Severance's notes indicate that she was awaiting SIRS testing results, but that plaintiff remained on the 2P wait list. (Id.) Severance ordered plaintiff to wear a safety suit while in the classroom to prevent self-harm. (Pl.'s Dep. at 25-26.)

On September 9, 2005 at 2:20 p.m., Severance received a phone call from Dr. Sokolov. (Doc. No. 129, Ex. G at 15.) Dr. Sokolov reported that plaintiff had tested positive for malingering and ordered that plaintiff be taken off of the 2P waiting list and returned to his cell in a blue suit. (Id.)

On September 9, 2005 at 2:43 p.m., plaintiff received a visit from his fiancée. (Am. Compl. ¶ 39; Pl.'s Dep. at 26.) In order to see his fiancée, plaintiff was required to change out of his blue suit and into his jail issued clothing. (Id.)

Following his visit with his fiancée, plaintiff returned to the control booth so as to be allowed back into the classroom. (Pl.'s Dep. at 28-29.) Plaintiff, however, was informed by defendant sergeant Pederson and defendant deputies Painter and Kacalek that, based upon the results of the SIRS test, he was being returned to his assigned housing. (Id.) At this time, plaintiff was informed of the results of his SIRS assessment. (Id. at 30.)

/////

Plaintiff refused to return to his assigned housing and, instead, returned to the classroom. (Pl.'s Dep. at 30-31.) Sergeant Pederson informed plaintiff that she would call additional staff if he continued to refuse. (Id. at 31.) Sergeant Pederson and deputies Painter and Kacalek returned to the control booth. (Id.)

Subsequently, deputies Kearsing, Painter, and Kacalek returned to the classroom to retrieve plaintiff. (Pl.'s Dep. at 31.) The three defendants attempted to convince plaintiff to return to his assigned housing. (Id.) Deputy Painter told plaintiff, "Look, man, don't make this hard on yourself. Just go back to your . . . cell . . . . If don't nobody come to see you by tomorrow, I'll make sure somebody comes and sees you." (Id.) Plaintiff eventually acquiesced and was returned to his assigned housing, where he was required to wear a "blue suit.[7]" (Id.; Kacalek Decl. ¶¶ 16-17.)

On September 9, 2005 at 5:00 p.m., Severance's notes indicate that plaintiff was returned to his cell, but that he was very agitated and angry regarding the blue suit protocol and being discontinued from the 2P wait list. (Doc. No. 129, Ex. G at 15.) Plaintiff demanded to be seen by a doctor or JPS staff. (Id.) After contacting Dr. Sokolov again, Severance was informed that plaintiff was not to be seen again. (Id.) Per her notes, "[plaintiff] was already seen by [JPS] staff today and evaluated, and custody provided patient [with a] full explanation for blue suit protocol. Advised custody staff of this and that JPS would not be seeing [plaintiff] again tonight." (Id.)

On September 9, 2005 at 5:10 p.m., Severance received a phone call from custody staff, who stated that plaintiff "threaten[ed] to off on custody staff." (Doc. No. 129, Ex. G at 15.)

/////

---

[7]A "blue suit" is a velcro safety suit designed to provide additional protection for certain inmates as the materials are not easily torn. (Kacalek Decl.¶¶ 21-22.)

15

On the morning of September 10, 2005, plaintiff was interviewed through a food port by an unidentified member of JPS. (See Doc. No. 129, Ex. G at 14.) Plaintiff reportedly threatened to "take out an officer to get the help that [he] needs" and demanded an explanation as to why he had been "blown off." (Id.) Plaintiff was informed of the results of his SIRS assessment and Dr. Sokolov's decision to not admit plaintiff to 2P for his suicidal ideations. (Id.)

Plaintiff was "upset and frustrated" by these decisions, protocols and preliminary diagnoses. (Doc. No. 129, Ex. G at 14.) He informed the JPS staff member that he had a history of psychiatric medications in 2002 (Seroquel and lithium) and that his attorney was attempting to obtain his prison file for this information. (Id.) He continued to report episodic hallucinations and ongoing depression, though the JPS staff member noted that plaintiff stated he did not have suicidal ideation or intent on that day. (Id.) Plaintiff requested to be seen by Dr. Sokolov. (Id.) The JPS staff member concluded that plaintiff did not meet 5150 criteria. (Id.)

During his deposition, plaintiff disputed the JPS staff member's finding that he did not have suicidal ideations on September 10, 2005:

Q: On [September 10, 2005] –

A: Yes.

Q: -- were you telling this person that you were having hallucinations?

In other words, that you were seeing or hearing things that weren't really there?

In other words, that you were hearing voices or seeing people in your cell or anything like that?

A: I don't know – I know he asked me – he asked me, "What's going on, man?"

/////

16

> And I told him that I'm stressing behind my brother, man. I'll hear my brother [*sic*] voice sometimes. Sometimes I'll see his face.
>
> And he asked me, "Did you tell this to the doctor?"
>
> And I said, "I haven't seen a doctor."
>
> And he said, "Well, you're in a suit. Did you ever tell them that you felt suicidal?"
>
> And I told him, "Yeah."
>
> "Do you feel suicidal now?"
>
> "Yeah."
>
> But by me telling him this, it didn't do no good. And I see from right here in the report, he don't even mention it.
>
> . . .

(Pl.'s Dep. at 55-56.)

On the morning of September 11, 2005, plaintiff was found without a pulse in his cell. (Doc. No. 116, Ex. G at 2, 5.) According to the incident report, plaintiff was found kneeling in front of his desk with a home made rope attached to a light fixture. (Id. at 5, 11.)

After plaintiff was resuscitated, he was transported to the U.C. Davis Medical Center. (Doc. No. 129, Ex. E, N.) Following an MRI, CT scan, and x-rays, it was determined that plaintiff did not have any injuries to his neck. (Doc. No. 116, Ex. F at 8.)

On November 5, 2005, plaintiff underwent a psychological evaluation for the purpose of determining his competence to stand trial. (Pl.'s Opp'n, Ex. C at 1-7.) The conclusion of that examination is as follows:

> In my opinion, based upon the aforementioned data, the defendant is barely able to understand the nature of the charges but and [*sic*] he is unable to assist counsel in his defense in a rational manner. I believe Mr. Martin is NOT competent to stand trial. He attempted to hang himself while in custody at the jail. He was found, lifeless,

17

> hanging in his cell. Paramedics were called and were able to successfully resuscitate him. It appears he was unconscious and not breathing for several minutes. So while there is credible evidence that he may have been competent to stand trial prior to his suicide attempt and may have been malingering his attempt was almost successful that he probably caused brain damage which now makes him not competent. Without a neurological exam, an MRI, a full and complete physical and neuropsychological testing, it is my opinion that no mental health provider could determine he is competent to stand trial . . . . If various mental and physical exams are normal, then the defendant could very well be malingering. Give the facts and information I have at this time, and that is not assisting his counsel, I certainly cannot find him competent . . . .

(Pl.'s Opp'n, Ex. C at 6.)

On December 14, 2005, the Honorable David W. Abbott of the Sacramento Superior Court held a hearing by request of plaintiff's counsel addressing plaintiff's mental competence. (Doc. No. 116, Ex. D at 12-14.) On March 16, 2006, Judge Abbott ordered plaintiff committed to Napa State Hospital ("NSH") for a determination as to his mental competence. (Id.) He also ordered a report due within ninety days of commitment concerning plaintiff's progress. (Id.)

On June 7, 2006, plaintiff was admitted to NSH. (Doc. No. 116, Ex. D at 16.)

On September 28, 2006, the Medical Director of the hospital provided a clinical summary of plaintiff, reproduced in part below:

> On admission to NSH, [plaintiff] denied current or recent psychotic symptoms such as delusions and hallucination, but reported he experienced hallucinations in the distant past. He described his mood as "good," and denied being depressed. He reported not sleeping for two days prior to admission, but denied other neurovegetative symptoms of depression (lack of energy or change in appetite). He denied hopelessness, helplessness and suicidal ideation. He became tearful when discussing his brother's death, but otherwise his affect was blunted. His score on the Folstein Mini Mental Status Exam was 21 out of possible 30 points. He appeared to be unaware of the season, day, date and county, but was able to name three previous presidents, the governor of California and the capital of California.

Since his admission to the hospital, we have noticed numerous examples of inconsistencies in his behavior, cognitive functioning, his history and results of testing that have complicated efforts to clarify his diagnosis and determine his level of competency to stand trial. For example, in "formal" situations such as Competency Group and Treatment Planning Conferences, he appears to have difficulty understanding what is being said. In contrast, in an informal setting, he was able to discuss with the unit psychologist specific details of a defense strategy for one of his charges.

He has also been inconsistent in reporting auditory hallucinations. On June 7, he denied having any recent or current hallucinations. On June 9, he reported hearing a voice, the description of which wsa not consistent with any known mental disorder. As he approached the anniversary of his brother's death (June 30), he reported hearing voices that were more consistent with genuine auditory hallucinations.

[Plaintiff] can be organized and coherent in a selective manner. He can also appear inattentive when discussing a topic with which he is uncomfortable. In benign conversation, he reciprocates in a logical, intelligent manner. When asked to discuss aspects of his case or his threatening behavior at the hospital, he responses are delayed. This ability to shift attention and organization in a selective manner is not consistent with known cognitive disorders.

. . .

On two administrations of a [memory test] designed to evaluate malingering and feigning of memory, his scores indicated that he exaggerated his memory deficits. On two measures designed to evaluate malingering, feigning and other forms of dissimulation of psychiatric illness . . ., he endorsed symptoms that rarely occur in diagnosed psychiatric patients. On two measures of personality and psychiatric symptoms, he responded in an extremely exaggerated manner, endorsing a wide variety of rare symptoms and attitudes. This response pattern is best attributed to malingering.

(Doc. No. 116, Ex. D at 19-20.) The Medical Director also provided his opinion and recommendation:

It is our opinion that [plaintiff] is able to understand the nature of the criminal proceedings and to assist counsel in the conduct of a defense in a rational manner, and that he has regained mental competence.

> [Plaintiff] is a man with significantly impaired cognitive functioning, Antisocial Personality Disorder and a history of abusing multiple substances. He was committed to NSH for restoration of competency to stand trial. His attorney reported that following an attempted hanging in September 2005, [plaintiff] had trouble focusing and discussing his case. It should be oted that [plaintiff] has something to gain from avoiding trial, as he is facing a potential life sentence, if convicted on the "third strike" felony with which he is charged.

> Although he has significant cognitive impairment on accepted psychological measures, he exaggerates the extent of that impairment. On numerous occasions, he has expressed knowledge of the charges against him, potential penalties, and defense strategies. He has had conversations with various staff members indicating an ability to stay focused and concentrate. As previously mentioned, he appears to have delayed responses only when the topic is of a sensitive nature. . . .

> It is evident from the test data, staff observations and review of the history that [plaintiff] is malingering (i.e., feigning or exaggerating) certain cognitive and psychiatric symptoms in order to appear incompetent to stand trial.

(Doc. No. 116, Ex. D at 17-21.)  The Medical Director's final recommendation regarding

plaintiff's mental competence is as follows:

> [Plaintiff] has been under treatment and observation since the date of admission to this hospital.  It is the consensus of the treating Clinical Staff that the defendant is now able to understand the nature of the charge(s) against him/her and can cooperate with the attorney in his/her defense.  Pursuant to section 1372 of the Penal Code, I hereby certify that said defendant is now mentally competent.

(Doc. No. 116, Ex. D at 16.)

/////

/////

/////

/////

/////

# SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material, in support of its contention that the

dispute exists.  <u>See</u> Fed. R. Civ. P. 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, <u>see</u> <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433,

1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial.'"  <u>Matsushita</u>, 475 US. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any. Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  <u>See</u> <u>Anderson</u>,

477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

court must be drawn in favor of the opposing party.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.

Nevertheless, inferences are not drawn out of the air, and it is the opposing

party's obligation to produce a factual predicate from which the inference may be drawn.  <u>See</u>

<u>Richards v. Nielsen</u> <u>Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d

898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do

more than simply show that there is some metaphysical doubt as to the material facts . . . .
Where the record taken as a whole could not lead a rational trier of fact to find for the
nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation
omitted).

On February 14, 2008, , the court advised plaintiff of the requirements for
opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. <u>See</u> <u>Rand v.
Rowland</u>, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), <u>cert.</u> <u>denied</u>, 527 U.S. 1035 (1999), and
<u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988).

## ANALYSIS

The Eighth Amendment prohibits the imposition of cruel and unusual
punishments and "embodies broad and idealistic concepts of dignity, civilized standards,
humanity and decency." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102 (1976) (citation and internal
quotations omitted); <u>see</u> <u>also</u> <u>Hutto v. Finney</u>, 437 U.S. 678, 685 (1978). The Supreme Court has
established that the government has an Eighth Amendment duty to provide medical care for
prisoners. <u>Estelle</u>, 429 U.S. at 103.

Although not every breach of this duty is a violation of constitutional rights,
"deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and
wanton infliction of pain' proscribed by the Eighth Amendment." <u>Estelle</u>, 429 U.S. at 104
(quoting <u>Gregg v. Georgia</u>, 426 U.S. 153, 173 (1976)); <u>Hutchinson v. United States</u>, 838 F.2d
390, 394 (9th Cir. 1988). Because pretrial detainees are not convicted prisoners, the rights of
those in police custody to receive medical treatment arise under the Due Process Clause of the
Fourteenth Amendment. <u>See</u> <u>Revere v. Massachusetts General Hosp.</u>, 463 U.S. 239, 244 (1983).
However, even though pretrial detainees claims "arise under the due process clause, the eighth
amendment guarantees provide a minimum standard of care for determining [a prisoner's] rights

23

as a pretrial detainee, including [the prisoner's] rights ... to medical care." <u>Jones v. Johnson</u>, 781 F.2d 769, 771 (9th Cir. 1986).  In fact, the due process rights are at least as great as the Eighth Amendment protections available to a convicted prisoner.  <u>Revere</u>, 463 U.S. at 244.

To assert an Eighth Amendment claim, then, for deliberate indifference, a prisoner must satisfy two requirements: one objective and one subjective.  <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994).  In <u>Farmer</u>, the Supreme Court held that,

> [T]he deprivation alleged must be, objectively, "sufficiently serious[;]" a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." . . . The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind."

<u>Id.</u>  That state of mind is shown when plaintiff can prove "deliberate indifference."  <u>See</u> <u>id.</u>  Deliberate indifference is evidenced only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  <u>Id.</u> at 837.

In an Eighth Amendment claim for deliberate indifference in the medical context, a plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  <u>Estelle</u>, 429 U.S. at 106.  In <u>Estelle</u>, the Supreme Court held that,

> In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.

<u>Id.</u>, 429 U.S. at 105-06.

In this Circuit, deliberate medical indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Hutchinson, 838 F.2d at 394. To meet the requirements of a claim for deliberate indifference, a plaintiff must show a purposeful act or failure to respond to pain or possible medical need resulted in harm. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled in part on other grounds by WMX Techs, Inc. v. Miller, 974 F.2d 1133, 1136 (9th Cir. 1997); Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006) (finding deliberate medical indifference when, for over a year, prison medical personnel knew but failed to respond to a prisoner's need to have a broken thumb examined and treated by a specialist and the delay led to deformity); but see Wood v. Housewright, 900 F.2d 1332 (9th Cir. 1990) (finding no deliberate medical indifference when prison medical staff provided medical care after confiscation of a medical device caused pins in a prisoner's shoulder to break).

## A.     Defendant Mark Hopkins

Plaintiff claims defendant Hopkins was deliberately indifferent to his medical needs by failing to obtain his medical records even though he had notice that plaintiff was a participant in CCCMS.

Hopkins interviewed plaintiff on August 28, 2005 following a referral by custody staff for psychotic behavior. At this interview, Hopkins noted plaintiff was experiencing auditory and visual hallucinations. However, Hopkins found plaintiff did not have suicidal ideations and did not meet 5150 criteria.

There is no evidence that Hopkins ever attempted to obtain plaintiff's medical records. Plaintiff testifies that this information was never obtained by JPS until this litigation commenced despite Hopkins's awareness of plaintiff's participation in CCCMS and his

statements regarding his various medications. Plaintiff's testimony raises an inference that defendants did not, in fact, obtain his medical records. Defendants have not provided any proof to evidence that they have obtained his medical records.

Here, then, a material dispute arises as to whether defendant Hopkins ever obtained plaintiff's medical records, which evidence an extensive mental health history for which plaintiff had been prescribed medication numerous times, in order to fully evaluate his mental health needs when he had notice of plaintiff's participation in CCCMS and whether that failure constitutes deliberate indifference. Because this is a question for the jury, see L.W. v. Grubbs, 92 F.3d 894, 895 (9th Cir. 1996), the court recommends that summary judgment be denied as to defendant Hopkins.

**B.      Defendant Gregory Sokolov, M.D.**

Plaintiff claims Dr. Sokolov violated his constitutional rights by failing to obtain plaintiff's medical records so as to fully evaluate his mental health needs, resulting in an unnecessary referral to Dr. McDermott and an erroneous assessment that prevented plaintiff from receiving appropriate medical help.

Per the record, Dr. Sokolov interviewed plaintiff on August 24, 2005. During the course of that interview, Dr. Sokolov became aware that plaintiff participated in CCCMS, had previously been prescribed medication for depression, and was displaying "bizarre" symptoms. Further, plaintiff signed a medical release form, allowing Dr. Sokolov to obtain his medical records.

Following this interview, Dr. Sokolov diagnosed plaintiff with psychotic disorder, either a secondary result of his previous seizures or a display of malingering, and referred plaintiff to Dr. McDermott for a determination as to the question of malingering. Based upon the

results of Dr. McDermott's test, plaintiff was eventually denied medication for his alleged depression and denied psychiatric care following his claims of suicidal ideations.

In support of his motion, Dr. Sokolov posits the theory that he suspected plaintiff was malingering his symptoms for the purpose of obtaining medications that have a potential for drug abuse and for securing a mental health defense in his criminal trial for which he was facing life imprisonment under California's three strike law. Dr. Sokolov relies upon the expert testimony of Dr. Charles Meyers and Dr. Michael Vitacco, who conclude that defendant Sokolov acted reasonably. Plaintiff, however, presents evidence that he faced life imprisonment based on his previous charges for which he was awaiting trial during the one year he was imprisoned prior to posting bail and, during that one year period, he never asked for medication or was seen by or referred to JPS.

There is no evidence that Dr. Sokolov ever attempted to obtain plaintiff's medical records. Plaintiff testifies that this information was never obtained by JPS until this litigation commenced despite Dr. Sokolov's awareness of plaintiff's participation in CCCMS and his statements regarding his various medications. Plaintiff's testimony raises an inference that defendants did not, in fact, obtain his medical records. Defendants have not provided any proof to evidence that they have obtained his medical records.

Here, then, a material dispute arises as to whether Dr. Sokolov ever obtained plaintiff's medical records, which evidence an extensive mental health history for which plaintiff had been prescribed medication numerous times, in order to fully evaluate his mental health needs when he had notice of plaintiff's participation in CCCMS and whether that failure constitutes deliberate indifference. Because this is a question for the jury, see L.W. v. Grubbs,

/////

92 F.3d 894, 895 (9th Cir. 1996), the court recommends that summary judgment be denied as to Dr. Sokolov.

## C.  Defendant Barbara McDermott, Ph.D.

Plaintiff claims Dr. McDermott violated his constitutional rights by administering a test unrelated to the symptoms of which he complained and concluding that plaintiff was malingering.

Upon review of the record, the court finds that plaintiff has not pled sufficient facts to defeat defendants' motion for summary judgment as to Dr. McDermott.  The facts provide that plaintiff was referred to Dr. McDermott by Dr. Sokolov following the latter's interview with plaintiff on August 24, 2005.  Dr. McDermott administered a standard fifty-question test to evaluate plaintiff's symptoms.  Based upon the results of this test, plaintiff was found to be malingering.

Although plaintiff disagrees with the purpose and type of test administered by Dr. McDermott and her assessment of his symptoms, plaintiff testified that he did not think Dr. McDermott intended her results to be erroneous or that she engineered the test to give plaintiff bad results.  There is no evidence that Dr. McDermott knew of and disregarded an excessive risk to plaintiff.  See Farmer, 511 U.S. at 834.

In light of these facts, the court finds no reasonable jury could find defendant McDermott deliberately indifferent to plaintiff's medical needs.

Accordingly, the court recommends defendants' motion for summary judgment be granted as to defendant McDermott.

/////

28

### D.      Defendant Laurie Severance

Plaintiff claims defendant Severance violated his constitutional rights by failing to provide additional protection in light of his suicidal ideations even though she was ordered to return plaintiff to his assigned housing.

The records reflects that Severance interviewed plaintiff on the morning of September 9, 2009 and found that he exhibited behavior warranting a 5150 hold, the issuance of a safety suit, and maintenance of plaintiff's name on the 2P waiting list.  Later that afternoon, Severance received a phone call from Dr. Sokolov.  (Doc. No. 129, Ex. G at 15.)  Dr. Sokolov reported that plaintiff had tested positive for malingering and ordered that plaintiff be taken off of the 2P waiting list and returned to his cell in a blue suit.  When plaintiff exhibited aggressive behavior upon his return to assigned housing, Severance again contacted Dr. Sokolov for guidance and was informed that plaintiff would not be seen by JPS again.

Upon review, the court finds that no reasonable jury could conclude that defendant Severance acted with deliberate indifference.  She interviewed plaintiff upon her arrival to the classroom and found that he exhibited behavior sufficient for a 5150 hold.  Further, she ordered that he wear a safety suit to protect him from harming himself.  Lastly, upon plaintiff's return to his assigned housing, she again contacted defendant Sokolov in response to his demand to be seen by JPS.  There is no evidence that defendant Severance had a "sufficiently culpable state of mind" to be guilty of deliberate indifference towards plaintiff's safety.  Farmer, 511 U.S. at 834.

Based thereon, the court recommends summary judgment be granted as to defendant Severance.

/////

**E.     Defendant Julie Pederson**

Plaintiff claims defendant Sergeant Pederson violated his constitutional rights by allegedly failing to take additional steps to protect plaintiff from hurting himself.

The protocol for an individual in defendant Pederson's position when confronted with a suicidal inmate is to place a 72-hour hold on an individual that they conclude meets the criteria of being a danger to him or herself or others or are gravely disabled. They are taught that if they conclude that a person is potentially suicidal, their responsibility as a housing officer requires that they take steps to safeguard the inmate and refer the inmate to JPS. JPS will then determine whether the inmate could be safely returned to his housing or whether the inmate should be rehoused in the inpatient psychiatric unit.

The primary practice for safeguarding a suicidal inmate while waiting for a JPS assessment is to remove the inmate from his or her cell and place him or her in a classroom that is located directly opposite the glassed control booth so that the inmate may be kept under observation of the control officer. Under most circumstances, the inmate is handcuffed in the classroom while he or she awaits assessment by qualified psychiatric staff. After psychiatric staff makes the suicide assessment, if JPS determines that the inmate is suicidal, the inmate is housed in the in-patient psychiatric facility located on the second floor of the Mail Jail. Those inmates that engage in suicidal gestures but have been cleared by psychiatric staff may be returned to general population housing and required to wear a blue suit.

Here, the evidence is undisputed that prison protocol was followed when plaintiff stated he wanted to kill himself: plaintiff was placed in a classroom with handcuffs while the deputies awaited a determination by JPS. Following two interviews by JPS social workers and a

final determination by Dr. Sokolov that plaintiff was malingering, plaintiff was ordered to wear a blue suit and returned to his assigned housing unit in the general population.

During his deposition, Plaintiff testified as to the essence of his claim against Sergeant Pederson:

> Q: So your complaint against Sergeant Peterson [*sic*] is that you would have liked her to keep you in the classroom –
>
> A: Anything.
>
> Q: -- wait – and tell one of her supervisors, a lieutenant, that you shouldn't be put back in your cell; is that correct?
>
> . . .
>
> A: My opinion is, if they knew that I was feeling in what I was doing, yeah, either keep me in the classroom – it's not hurting nobody. It's not like they use it for school. It's a classroom. It's used for – it's used for what I'm there for, for people – it's used as a detaining cell for people until they get to psych services or whatever.
>
> Yeah, if they could have kept me there to let me go through what I was going through, or move me down to Jail Psych Services, that was not a option for Sokolov. So keep me there, and if you don't want to be held responsible, notify your supervisor, you know.

(Pl.'s Dep. at 68.) Thus, plaintiff's claim is that despite the JPS medical director's order to return plaintiff to his assigned housing based on the determination that plaintiff was malingering, sergeant Pederson should have kept him in the classroom.

Sergeant Pederson, however, did not have the authority to override JPS's determination regarding plaintiff. She is not a psychologist or psychiatrist. (Pederson Decl. ¶ 33.) She has not received medical training except for first aid or CPR. (Id.) She has not been trained to diagnose mental illness and is not qualified to determine whether or not someone is actively suicidal. (Id. ¶ 34.)

Moreover, as a sergeant, Sergeant Pederson cannot order JPS to admit an inmate to 2P or order JPS to place an inmate on a wait list for 2P, or order JPS to take any suicide

precautions. (Pederson Decl. ¶ 30.) Finally, the decision to place plaintiff in a blue suit was one made by JPS, not Sergeant Pederson. (Id. ¶ 37.)

The court finds that, based upon the evidence, no reasonable jury could find Sergeant Pederson deliberately indifferent to plaintiff's medical needs. Sergeant Pederson reasonably relied upon JPS's determination that plaintiff was malingering and should be returned to his assigned housing with a blue suit. Sergeant Pederson was under no obligation – constitutional or otherwise – to provide additional suicide precautions than those approved by JPS.

Based on the foregoing, the court recommends that summary judgment be granted as to sergeant Pederson.

**F.    Defendant Deputy Brian Painter**

Plaintiff claims defendant Deputy Painter violated plaintiff's constitutional rights by allegedly failing to take additional steps to protect plaintiff from hurting himself.

As discussed above, the protocol for an individual in Deputy Painter's position when confronted with a suicidal inmate is to place a 72-hour hold on an individual that they conclude meets the criteria of being a danger to him or herself or others or are gravely disabled. They are taught that if they conclude that a person is potentially suicidal, their responsibility as a housing officer requires that they take steps to safeguard the inmate and refer the inmate to JPS.

The primary practice for safeguarding a suicidal inmate while waiting for a JPS assessment is to remove the inmate from his or her cell and place him or her in a classroom that is located directly opposite the glassed control booth so that the inmate may be kept under observation of the control officer. Under most circumstances, the inmate is handcuffed in the classroom while he or she awaits assessment by qualified psychiatric staff. After psychiatric

staff makes the suicide assessment, if JPS determines that the inmate is suicidal, the inmate is housed in the in-patient psychiatric facility located on the second floor of the Mail Jail. Those inmates that engage in suicidal gestures but have been cleared by psychiatric staff may be returned to general population housing and required to wear a blue suit.

Here, the evidence is undisputed that prison protocol was followed when plaintiff stated he wanted to kill himself: plaintiff was placed in a classroom with handcuffs while the deputies awaited a determination by JPS. Following two interviews by JPS social workers and a final determination by Dr. Sokolov that plaintiff was malingering, plaintiff was taken off of the waitlist for 2P, ordered to wear a blue suit, and returned to his jail cell by deputies Painter, Kacalek, and Kearsing.

Deputy Painter is not a psychologist or a psychiatrist. (See Painter Decl. ¶ 7.) He has not received medical training except for first aid and CPR. (Id.) He has not been trained to diagnose mental illness and is not qualified to determine whether or not someone is actively suicidal. (Id.)

The court finds that, based upon the evidence, no reasonable jury could find Deputy Painter deliberately indifferent to plaintiff's medical needs. He reasonably followed the orders of his supervisor and reasonably relied upon JPS's determination that plaintiff was malingering and should be returned to his assigned housing with a blue suit.

Additionally, there is no evidence that Deputy Painter had a "sufficiently culpable state of mind" to be guilty of deliberate indifference towards plaintiff's safety. Farmer, 511 U.S. at 834. To the contrary, the evidence also illustrates that Deputy Painter did attempt to assure plaintiff that, upon his return to his assigned housing, he would "make sure somebody comes and sees you" if plaintiff isn't seen by JPS.

Accordingly, the court recommends that summary judgment be granted as to Deputy Painter.

**G.     Defendant Deputy Ryan Kacalek**

Plaintiff claims Deputy Kacalek violated plaintiff's constitutional rights by allegedly failing to take additional steps to protect plaintiff from hurting himself.

For the reasons set forth above with respect to Deputy Painter, the court recommends that summary judgment be granted as to defendant Deputy Kacalek.

**H.     Defendant Deputy Jason Kearsing**

Plaintiff claims Deputy Kearsing violated plaintiff's constitutional rights by allegedly failing to take additional steps to protect plaintiff from hurting himself.

For the reasons set forth above with respect to Deputy Painter, the court recommends that summary judgment be granted as to defendant Deputy Kearsing.

**I.     Defendant Sacramento County Board of Supervisors**

Finally, Plaintiff claims defendant Sacramento County Board of Supervisors violated his constitutional rights by failing to (a) conduct an objective, accurate and thorough inspection of the Sacramento County Jail to determine whether it is providing adequate mental health services and whether it is in compliance with California regulations regarding mental health; (b) accurately report to the California legislature on conditions within the Sacramento County Jail, including four suicides in 2005; and (c) provide sufficient funds for programs like JPS to assist all individuals in need of mental health care. Plaintiff further claims that these failures evidence a conspiracy with the other named defendants to deny plaintiff adequate mental health care.

Municipalities are "persons" under 42 U.S.C. § 1983 and thus may be liable for causing a constitutional deprivation. <u>Monell v. New York City Dept. Of Social Services</u>, 436 U.S. 658, 690 (1978). A municipality, however, may not be sued under § 1983 solely because an injury was inflicted by its employees or agents. <u>Id.</u> at 694. Instead, it is only when execution of a government's policy or custom inflicts the injury that the municipality as an entity is responsible. <u>Id.</u> A policy is " 'a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.' " <u>Fairley v. Luman</u>, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam) (internal citations and quotations omitted).

A policy can be one of action or inaction. <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989). Under <u>Canton</u>, a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation. <u>Id.</u> at 387-89. To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights. <u>Gibson v. County of Washoe</u>, 290 F.3d 1175, 1193-94 (9th Cir. 2002), cert. denied, 537 U.S. 1106 (2003).

Defendant Sacramento County Board of Supervisors funds Correctional Health Services ("CHS"), which provides medically necessary medical, mental health and dental care for adults detained at county operated correctional facilities. (O'Shaughnassy Decl. ¶¶ 5-6.) The

Sheriff's Department oversees the basic and emergency health care services provided adults incarcerated within the county jail system and is responsible for administering CHS. (Id. ¶ 7.) During the 2005-2006 fiscal year, CHS was allocated approximately $34 million by defendant Sacramento County Board of Supervisors. (Id. ¶ 9.)

Upon review of the record, the court finds no reasonable jury could find defendant Sacramento County Board of Supervisors was deliberately indifferent to plaintiff's medical needs. As an initial matter, to the extent plaintiff claims he did not receive mental health services because JPS was poorly funded, his argument fails. Per plaintiff's medical notes, plaintiff was returned to his assigned housing on September 9, 2005 because defendant Dr. Sokolov determined plaintiff was malingering his symptoms and did not meet 5150 criteria, not because JPS was poorly funded.

Further, the court finds plaintiff's remaining arguments to be merely conclusory allegations. Plaintiff has presented no evidence to support his assertion that this defendant failed to conduct an objective, accurate and thorough inspection of the Sacramento County Jail to determine whether it is providing adequate mental health services and whether it is in compliance with California regulations regarding mental health. Plaintiff has further failed to present any evidence that this defendant failed to accurately report to the California legislature on conditions within the Sacramento County Jail, including four alleged suicides in 2005.[8]

Lastly, assuming *arguendo* one of the other named defendants violated plaintiff's constitutional rights, plaintiff failed to show a custom or policy of defendant Sacramento County Board of Supervisors that amounts to deliberate indifference or that was the moving force behind

---

[8]Plaintiff relies on a Sacramento Bee newspaper article entitled *History of Problems* that discusses four suicides that occurred in 2005 in the Sacramento County Jail. (Pl.'s Opp'n, Ex. C at 4.)

the employee's violation of plaintiff's constitutional rights. See Gibson, 290 F.3d at 1193-94. The court notes that plaintiff submits as evidence a memorandum from Captain Mark M. Iwasa, Commander of the Mail Jail Division, regarding 2P overcrowding due, in part, to those inmates who engage in suicidal gestures for the purpose of securing 2P housing and/or prolonging court proceedings. (See Pl.'s Opp'n, Ex. C at 4.) This memorandum, however, is dated October 14, 2005, more than one month after plaintiff's suicide attempt. There is nothing to suggest this policy was in place when plaintiff was ordered to wear a blue suit. Moreover, as discussed earlier, plaintiff was not denied access to 2P due to overcrowding, but instead due to a finding of malingering.

Accordingly, the court recommends that summary judgment be granted as to defendant Sacramento County Board of Supervisors.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Summary judgment be granted as to defendants McDermott, Severance, Pederson, Painter, Kacalek, Kearsing, and Sacramento County Board of Supervisors.

2. Summary judgment be denied as to defendants Sokolov and Hopkins.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The

37

parties are advised that failure to file objections within the specified time may waive the right to

appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 18, 2010.


UNITED STATES MAGISTRATE JUDGE

/014; mart0863.msj